**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------ X

HARVEY MURPHY and KATYRIA GILER COLON,
on behalf of herself and her minor children, N.J. and
K.J.,

                               Plaintiffs,

      -against-

THE CITY OF NEW YORK, a municipal entity;
NEW YORK CITY POLICE DEPARTMENT
OFFICER LT. ERIC S. DYM, sued in his individual
and official capacities; NEW YORK CITY POLICE
DEPARTMENT OFFICERS JOHN DOES 1-10, all
of whom are sued in their individual and their
official capacities.

    Defendants.
------------------------------------------------------------------ X

                                                   **COMPLAINT**
                                                   **23-CV-1925**

                                                   **JURY TRIAL DEMANDED**

## PRELIMINARY STATEMENT

1.      This civil rights action seeks redress for injuries Plaintiffs suffered from the unconstitutional conduct of Defendants THE CITY OF NEW YORK, and New York City Police Officers Eric S. Dym, and NEW YORK CITY POLICE DEPARTMENT OFFICERS JOHN DOES 1-10.

2.      On April 9, 2020, Plaintiff HARVEY MURPHY and LEVAR JONES were walking near 350 East 143rd Street, near the Mott Haven Houses, in the Bronx, in New York City. The Mott Haven Houses are largely Black and Latinx and heavily and disproportionately patrolled and surveilled by NYPD as a regular practice. That evening, Mr. Murphy was in the vicinity in his capacity as a community organizer, pursuant to reports from community members about severe increases in police harassment since COVID-19 restrictions were put into place.

Mr. Jones had attended a candle-lighting vigil for a child from the community who had died. The two men knew each other. As they were leaving the area, walking down the street, they were forcibly stopped by two plainclothes police officers, without any requests or commands relating to a search or a stop. The police officers turned their attention to Mr. Jones and quickly began a violent assault and takedown, grabbing him forcibly by a chain around his neck, beating and kicking him, and pulling his coat over his head. Mr. Jones was pepper sprayed, arrested, and taken to PSA 7, while still wearing a mask filled with pepper spray. After waiting for hours, he eventually received medical attention, and later received a desk appearance ticket.  The case was eventually dismissed.

3.     This shocking incident took place in the early days of the COVID-19 pandemic in New York City. The selective enforcement of COVID-19 social distancing rules, as well as the generalized stress of navigating the unknown threat of COVID-19 within the everyday, unleashed a wave of police harassment and violence in Black and Latinx communities in New York City.  Even when known, it was tolerated, licensed, and justified by City officials and leadership. Mr. Murphy, Mr. Jones, and many others in their community suffered from unwarranted attention, multiple violations of their constitutional rights, disproportionate arrests, and selective enforcement throughout this period, harassment that only escalated during the summer as demonstrations began citywide after the murder of George Floyd.

4.     At the time, and today, it was incumbent upon the NYPD to refrain from racial profiling, selective enforcement, and disproportionately risking the lives of Black and Latinx New Yorkers. NYPD's prior policy and practice that allowed unlawful stops of hundreds of thousands of New York City residents, particularly young Black and Latinx men, had been deemed illegal racial profiling in *Floyd et al. v. The City of New York*, 08-CV-1034 (AT)

(S.D.N.Y.), and NYPD remained under judicial oversight. At trial, the City was found to have maintained an unlawful policy and practice of stops, questioning, and frisks in violation of the Fourth and Fourteenth Amendments. *See Floyd v. City of New York*, 959 F.Supp.2d 540 (S.D.N.Y 2013). Nevertheless, Mr. Murphy and Mr. Jones were part of a *de facto* policy and practice of selective enforcement, surveillance, violence, and arrests in this period.

5.      Plaintiffs seek redress for the substantial injuries suffered when unlawfully stopped, beaten, arrested, and detained, and subject to the unlawful policies and practices of the City that led to these injuries and distress. Plaintiffs also seek relief for the ongoing unconstitutional policies and practices that enabled the violation of rights, ranging from March 1, 2020 – October 30, 2022. Plaintiffs seek (i) compensatory damages for psychological and emotional distress, and other financial loss caused by the illegal actions of the Defendants; (ii) punitive damages to deter such intentional or reckless deviations from well-settled constitutional law; and (iii) such other and further relief, including injunctive relief, costs and attorney's fees, as this Court deems equitable and just.

## JURISDICTION

6.      Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1343(a)(3) and (a)(4), as this action seeks redress for the violation of Plaintiff's constitutional and civil rights.

7.      Supplemental jurisdiction is conferred upon this Court by 28 U.S.C. § 1367(a) over any and all state law claims that are so related to the federal claims that they form part of the same case or controversy.

8.      Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202.

## VENUE

9.      Venue is proper in the United States District Court for the Southern District of

New York pursuant to 28 U.S.C. § 1391(b)(2), as this is the judicial district in which the events

giving rise to Plaintiff's claims took place. In addition, Defendants conduct business and

maintain their principal place of business in the counties of Bronx and New York, in the

Southern District of New York**.**

## JURY DEMAND

10.      Plaintiff demands a trial by jury in this action on each and every one of his claims

for which a jury trial is legally available.

## PARTIES

11.      Plaintiff HARVEY MURPHY is an African-American citizen of the United

States. During the relevant period, he was in his thirties and resided in the State of New York.

At all times relevant to this complaint, Mr. MURPHY was a resident of Mott Haven in the State

of New York, the borough of the Bronx, and Bronx County. He is a well-known member of the

community, and a social justice leader.

12.      Plaintiffs KATYRIA GILER COLON, and her minor children, N.J. and K.J., are

surviving descendants and dependents of LEVAR JONES, an African-American citizen of the

United States. During the relevant period, Mr. Jones was in his forties and resided in Mott

Haven, in the State of New York.  At all times relevant to this complaint, Mr. JONES was a

resident of Mott Haven in the State of New York, the borough of the Bronx, and Bronx County.

Ms. Colon and her children live in the same community and witnessed conduct set forth herein.

13.      Defendant CITY OF NEW YORK ("the City") is a municipal entity created and

authorized under the laws of the State of New York.  It is authorized under the laws of the State of

New York to maintain, operate, and govern a police department, the New York City Police Department ("NYPD"), which acts as its agent in the area of law enforcement and for which it is ultimately responsible. The law enforcement activities of the NYPD are supported in part by federal funds.

14.     Defendant Police Officers ERIC S. DYM, JANE DOE, and JOHN DOES 1-10 ("Individual Defendants") are NYPD Police Officers who unlawfully stopped, harassed, used unlawful force, and arrested and detained Plaintiff without any reasonably articulable suspicion of illegal activity.

15.     Upon information and belief, the Individual Defendants are still NYPD Police Officers, with the exception of Defendant Dym, who was nevertheless an NYPD member of service throughout the relevant period.

16.     At all times relevant herein, the Individual Defendants have acted under color of state law in the course and scope of their duties and/or functions as agents, employees, and/or officers of the City and/or the NYPD.

17.     At all times relevant herein, the Individual Defendants violated clearly established rights and standards under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution, of which a reasonably prudent police officer in their circumstances would have known.

## STATEMENT OF FACTS

18.     In early April 2020, Plaintiff Murphy was called by a community member who resided in the Mott Haven public housing projects and who had reported incidents of police brutality and shared videos of an individual who was being mishandled by the police. At the time, Plaintiff Murphy worked as a community organizer with JustLeadershipUSA, a grassroots

organization dedicated to criminal justice reform. Plaintiff Murphy and his colleagues had heard reports of an increase in police harassment in the Mott Haven community since the pandemic started in New York City.

19.     Pursuant to these reports, on April 9, 2020, Plaintiff Murphy was meeting with community in the Mott Haven Projects, following up on the complaints of police harassment of the community since the COVID-19 pandemic had begun in New York City.  At the community meeting, people described an uptick in police harassment since social distancing restrictions were put into place.

20.     Mr. Jones was in the vicinity to attend a candle-lighting on behalf of the child of a friend of his, who had recently died. He observed police in the vicinity of the vigil for the child.

21.     Following the meeting, the two men walked toward the store. They were walking together but maintaining physical distance. Mr. Jones was wearing an N95 mask.  Mr. Jones was a diabetic and had health complications that made him particularly fearful of a COVID-19 infection, and particularly serious about taking precautions.  His concerns were well-supported by information available in this period. *See* Cariou, B., Hadjadj, S., Wargny, M. et al.*, Phenotypic characteristics and prognosis of inpatients with COVID-19 and diabetes: the CORONADO study.* Diabetologia 63, 1500–1515 (2020) (). *See also,* Shelby Lin Erdman, *One in 10 Covid-19 patients with diabetes die within a week, study finds,* CNN (May 30, 2020), available at https://www.cnn.com/2020/05/29/health/diabetes-study-covid-19-

deaths/index.html?utm_content=2020-05-

30T13%3A04%3A07&utm_source=fbCNN&utm_term=link&utm_medium=social.

22.     While walking down the street, they saw two plainclothes officers driving slowly in an unmarked car, staring and slowly starting to follow them. One of officers in the car pointed his phone toward them.

23.     Mr. Jones was worried the plainclothes officers were going to harass them. Mr. Murphy and Mr. Jones created more social distance between themselves and discussed staying out of the street to avoid creating any basis for the officers to stop them. Eventually, each man pulled out his cell phone to record, fearing the police harassment, consistent with the stories they had just heard from members of the community.

24.     Shortly thereafter, the police officers in plainclothes swiftly jumped out of the car and ran up on the two men.  The officers wore no masks and took no precautions to mitigate the risk of spreading COVID-19 to the public. The officers said nothing, asked no questions, and evidenced no basis for the unlawful stop, excessive and unlawful use of force, or unlawful detention.  At no time were Mr. Jones or Mr. Murphy free to leave.

25.     One officer approached Mr. Murphy directly. He said nothing.  Mr. Murphy asked the police officer not to touch him repeatedly. The plainclothes officer grabbed Mr. Murphy's cell phone out from his hand, began pushing him, and threw his phone to the ground.   After he stopped, he had his hand on his gun and continuously told Mr. Murphy to back up. The officer then left Mr. Murphy and went to where Mr. Jones was being restrained.

26.     At the same time, another officer had approached Mr. Jones, shoved him, pushed him, flung Mr. Jones' phone to the ground and tried to step on it, and restrained Mr. Jones. Mr. Jones raised his arms to try to protect his head. The officer grabbed him by the chain he was wearing around his neck and pulled him to the ground. The officer who had stopped Mr. Murphy joined his colleague and they began to physically assault Mr. Jones, throwing him on the

pavement by his neck and punching and striking him multiple times as he was on the ground. Mr. Jones was assaulted several times in the head and torso, while wearing a mask and while being pepper sprayed. While on the ground, Mr. Jones felt several punches to the back of his head. Mr. Jones eventually realized that the second officer had left Mr. Murphy, joined the other plainclothes officer, and had started hitting him. The officers also began to kick at Mr. Jones with their knees.

27.     The second officer also pepper sprayed Mr. Jones at this time.  Mr. Jones was wearing a medical grade N95 mask, but the pepper spray rolled down his face, into the mask, and made it hard to breathe. The officers were also pulling up on the puffy coat Mr. Jones was wearing. Eventually, Mr. Jones' coat was very twisted around and covering his face, which also made it hard for him to breathe.

28.     Concerned for Mr. Jones, Mr. Murphy approached during this period and asked what the officers were doing. The officers then sprayed pepper spray at him. Mr. Murphy continued to record the encounter on his phone. Mr. Murphy observed as additional uniformed officers arrived, but the police continued assaulting Mr. Jones. Several officers coordinated their actions to facilitate or conduct this ongoing attack, involving excessive force and a clear, ongoing violation of Mr. Murphy's and Mr. Jones' rights. Mr. Murphy observed the attack to Mr. Jones until Mr. Jones was taken away in the police vehicle, and experienced his own police stop and harassment, and at no time were de-escalation or use of force tactical plans and reviews employed, as is required by the NYPD Patrol Guide. These unprovoked, unjustified, and unconscionable stops, assaults, and arrests occurred without any attempt to deescalate or mitigate the unnecessary and unlawful use of force.

29.     Eventually, the officers handcuffed Mr. Jones and forced him into the unmarked police vehicle. Mr. Jones had his arms restrained behind his back and was still wearing a mask, into which pepper spray had been sprayed.  Mr. Jones complained to the officers that he could not breathe and they accused him of faking it. While in the car, Mr. Jones observed one of the officers turned around from the front seat, recording with his body-worn camera. Mr. Jones briefly lost consciousness in the car and later woke to officers dragging him from the vehicle at PSA7, with his pants nearly at his ankles. The N95 mask was still covering his face.

30.     At PSA7, Mr. Jones was detained in a holding cell, handcuffed and shackled, still wearing a face mask and still breathing the pepper spray the officer had sprayed him with earlier on the street. Mr. Jones repeatedly asked for some liquid to rinse the pepper spray from his face. Mr. Jones' requests were never granted. The officers at the precinct would not even let him use the bathroom.

31.     Once at PSA7, Mr. Jones also immediately sought medical attention. Mr. Jones was diabetic. He was still wearing a mask, breathing pepper spray, and feeling dizzy from the punches to his head. Over the course of two hours, he informed several NYPD personnel of his desire to go to the hospital.

32.     While at PSA7, Mr. Jones spoke with an officer in a white shirt who claimed he was there to help and to evaluate the conduct of the officers who arrested him. Mr. Jones remained handcuffed, although detained in a jail cell. Mr. Jones asked him for something to wash the pepper spray from his eyes and face. Mr. Jones also told the officer he wanted to go to the hospital. The officer interviewed Mr. Jones but never provided anything for to rinse or wipe the pepper spray from his eyes or face.

33.     Eventually, Mr. Jones spoke with a sergeant, who said he would be taken to the hospital. Mr. Jones repeated his request for something to wash the pepper spray from his face, but he never provided any. Mr. Jones continued to wear his N95 mask and breathe a mixture of pepper spray and air, out of fear and anxiety of infection and death. The sergeant indicated that the plainclothes officer who had assaulted Mr. Jones would escort him to the hospital. Mr. Jones asked for a different escort, told the sergeant he did not feel safe with this officer, and told the sergeant the officer had assaulted Mr. Jones. The sergeant told Mr. Jones that he trusted the officer and that this officer would be the one to take him to the hospital.

34.     After some time, Mr. Jones was taken to Lincoln Hospital in the Bronx. Once there, the nurse asked the plainclothes officer to remove at least one of his handcuffs so that she could take vital signs, including blood pressure. The officer refused. The nurse stated that she could not proceed unless the handcuffs were removed. The officer continued to refuse her request.

35.     Initially, in the hospital, Mr. Jones was still wearing the same N95 face mask he had been wearing continuously while stopped, pepper sprayed, arrested, and detained at PSA7. In the emergency room, the plainclothes officer snatched the mask from Mr. Jones' face and said, "Now you're going to die."

36.     Mr. Jones was terrified to be in the hospital with sick people and without a mask on during the coronavirus pandemic, fearing infection or worse. Most people in the emergency department were wearing multiple face masks and full-body personal protective equipment. Mr. Jones remained in the emergency room for two hours, fully unprotected, until he was able to ask a nurse for a new mask. She found a mask for him and informed the officer that Mr. Jones should not be in the emergency room during the pandemic without a mask. The plainclothes officer was wearing a face mask continuously while in the hospital.

10

37. Mr. Jones was never treated at the hospital for his dizziness, or for his injuries during the assault by the police officer, or for the pepper spray Mr. Jones had been breathing without any opportunity to rinse or wipe his face since the time of his arrest. Mr. Jones' vitals were never taken. His blood sugar levels were never checked, even though he informed the medical staff he had diabetes and the monitoring of sugar levels is a routine step when someone with diabetes seeks medical care.

38. Mr. Jones never saw a doctor at Lincoln Hospital. He was not examined by any medical personnel. At some point, he saw the officer talking privately, off to the side, with one of the doctors in the hospital. Shortly after this, and without examining or speaking with him, the doctor issued discharge papers directly to the plainclothes officer. He was then taken back to PSA7. He continued to be handcuffed with his ankles shackled.

39. After returning to PSA7, he was given a photocopy of one side of a desk appearance ticket, informed he was being charged with "Obstruction of Governmental Administration," and he was released around 1:00 am. When he requested the officers' names and business cards, they told him to leave before they arrested him again.

40. Under criminal docket number 20-BX-010658, Mr. Jones was charged with disorderly conduct, in violation of New York Penal Law Section 240.20, obstruction of governmental administration, in in violation of New York Penal Law Section 195.05, and Resisting Arrest, in violation of New York Penal Law Section 205.30. He was arrested on April 9, 2020, given a DAT, and arraigned on October 29, 2020. The case was dismissed and sealed on May 6, 2021.

41. One NYPD officer involved in the stop, harassment, initiation and persistence of the use of force, and the arrest was retired NYPD Lieutenant Eric S. Dym. Eric S. Dym has the

distinction of having the highest number of pending complaints against an NYPD officer at the time who recently retired, after a finding that he should face firing as discipline for police misconduct. *See* Yoav Gonen, *Most-Complained-About NYPD Cop Retires, Avoiding Penalties*, The City, available at https://www.thecity.nyc/2022/9/19/23360186/nypd-eric-dym-civilian-complaints-retires. He was subject to significant scrutiny, disciplinary review and trial, and number of complaints, lawsuits, and settlements in his nearly 17-year tenure with the NYPD *See e.g.,* https://www.50-a.org/officer/67142#lawsuits-details. He had been subject to numerous complaints and investigations involving force, abuse, discourtesy, offensive language ("FADO"), and other affirmative misconduct on duty. The City was aware, actually and constructively, of his failures to serve the community yet he was ubiquitous in police action and misconduct throughout the relevant period.

42.     Throughout this period, Mr. Murphy and Mr. Jones experienced pain and suffering, including physical injury, anxiety, fear, and stress, from the NYPD officers' unprovoked attack. Mr. Murphy reported that he thought about what happened every day. In addition, this incident was situated within a context of frequent, predictable harassment and abuse by the police of community members in their neighborhoods, including themselves.  Mr. Jones and Mr. Murphy witnessed many other incidents of abuse with these officers in the same community, and even voiced concerns in that regard before the unlawful police stop on April 9, 2023.  Since the coronavirus epidemic began, they frequently saw police officers in the area stop, question, and arrest people without wearing masks or gloves or taking any social distancing or other precautions. The unlawful stops, arrests, and harassment of community member persisted and increased in the summer of 2020 as protests about police violence began citywide.

43.     Mr. Jones and Mr. Murphy were just two of many Mott Haven Houses residents and people in the vicinity of the Mott Haven Houses harassed, illegally stopped and searched, and experiencing the unlawful use of force in this period. These incidents were situated within a context of frequent, predictable harassment and abuse by the police of community members in their neighborhoods, including themselves.  Mr. Jones and Mr. Murphy witnessed many other incidents of abuse with these officers in the same community, and even voiced concerns in that regard before the unlawful police stop.  Since the coronavirus epidemic began, they frequently saw police officers in the area stop, question, and arrest people without wearing masks or gloves or taking any social distancing or other precautions. The experiences of police stop, arrest, abuse of authority, harassment, and selective enforcement that Mr. Murphy and Mr. Jones, and others during this period, were not grounded in any credible claim of individualized, reasonable articulable suspicion, probable cause, or even general inquiry.

**NYPD's Unconstitutional Pattern and Practice During the COVID-19 Pandemic**

44.     Despite ubiquitous narratives that "we are all in this together," many Black New Yorkers experienced the early months of the pandemic as periods of enhanced risk of stop, arrest, and police use of force and, concurrently, enhanced risk of illness or death, all on the basis of their race. Policies put in place by the City licensed selective enforcement and abusive and racialized policing practices, ignored known and foreseeable risks, violated constitutional rights, and placed Mr. Murphy and others in his community at risk. The extreme anxiety that was common in the COVID-19 pandemic was exacerbated for many Black New Yorkers living in the South Bronx throughout this period, and experiencing this selective enforcement of the law.

45.     Policing policy directly effectuated violations of constitutional rights. Selective enforcement and the foreseeable consequences of racial profiling involved an added layer of risk,

consequence, and harassment to the stress, anxiety, and uncertainty of navigating the COVID-19 pandemic.

> Findings suggest that ZIP codes with higher percentages of lower income and Black residents experienced disproportionately high rates of policing during the COVID-19 pandemic in the name of public health. Moreover, findings lend empirical support to claims made by legal advocates that COVID-19 policing mirrored the racially discriminatory practices of the stop-and-frisk program that were deemed unconstitutional. According to published reports, some COVID-19-related police stops were violent in nature, placing individuals at risk of physical harm….

*See* Sandhya Kajeepeta, *et al., Policing the pandemic: estimating spatial and racialized inequities in New York City police enforcement of COVID-19 mandates,* 32 Critical Public Health 56, 63-64 (2022) (citations omitted). Recent research affirms that "[p]ronounced spatial and racialized inequities in pandemic policing of public health" mimicked "historical policing practices deemed racially discriminatory." *Id. See also, e.g.,* Harald Schmidt, *The Way We Ration Ventilators is Biased*, The New York Times (April 15, 2020) (structural inequality leads to lower baseline health among particular racial and ethnic groups, resulting in a de-prioritization of those patients for ventilators).

46.     Among other policy decisions ignoring, denying, or justifying the culture of denial of systemic racism, racial inequity and inequality, and racial injustice, and the role of the government in this, the use of NYPD to enforce COVID-19 social distancing policy created a policy and practice that licensed, and even justified racial discrimination and bias, resulting in a foreseeable violation of rights in addition to heightened risk:

> [G]iven the high rates of coronavirus infection and low rates of mask wearing among NYPD officers, increased police presence in a neighborhood is expected to increase the overall risk of transmission in that area….Research shows that there are collateral consequences of police contact that spill over beyond the individual being stopped, impacting entire neighborhoods: Living

> in a neighborhood with high rates of police stops is associated with increased psychological distress, anxiety, post-traumatic stress, and asthma episodes among. This research also suggests that these spillover effects can be more pronounced among Black residents than white residents, thereby potentially producing and exacerbating racialized health inequities.

*Id.* at 63-64 (citations omitted).

47.     In New York City, the COVID-19 pandemic effectively began in March of 2020. In March 2020, in response to the COVID-19 outbreak in New York state, then-Governor Cuomo announced, in New York, that non-essential workers would be required to work from home. NYS Department of Health, *New York State on PAUSE*, (March 22, 2020) *available at* https://coronavirus.health.ny.gov/new-york-state-pause  ("effective at 8PM on Sunday, March 22, all non-essential businesses statewide will be closed"). Then-Mayor de Bill de Blasio also declared a social distancing plan, banning group gatherings, congregating in public, etc. for New Yorkers. Yet, there was no publication of guidelines or rules to structure enforcement of social distancing.  Notably, no curfew was ever instituted in New York City. People were asked to remain home (#StayHome), but never prohibited from leaving their homes other than for essential needs, as they were in some European countries. No proof of purpose, or justification of any kind, was mandated for people in public spaces in New York City.

48.     However, from the beginning, the City selectively enforced COVID-19 restrictions, often with a particular punitive, carceral, and force-ridden approach for Black and Brown New Yorkers and in Black communities in the City. The relevant period in this case is from March 1, 2020 until October 30, 2022.  It begins with the start of COVID-19 enforcement in New York City, which both licensed and tolerated an expansive version of police enforcement that selectively,  openly, and recklessly violated the constitutional rights of Black and Latinx New Yorkers and until the retirement of Defendant Dym, a significant driver of the misconduct

in Plaintiffs' community, who consistently leveraged and exploited pretextual opportunities to harass, use force, and violate the rights of the residents of Mott Haven Houses.

49.     The selective enforcement during COVID-19 grew into selective enforcement policies during the Black Lives Matter protests in the summer of 2023 in the Bronx, an enhancement of the policy of police harassment, abuse, and impunity, within the relevant period. As the New York City Civilian Complaint Review Board (CCRB) recently reported this period countenanced unlawful violence and violation of constitutional rights, including in the neighborhoods where Plaintiff and his community live and work.  *See* CCRB, 2020 NYC Protests (Feb. 6, 2023), available at https://www.nyc.gov/assets/ccrb/downloads/pdf/policy_pdf/issue_based/2020NYCProtestReport .pdf.

**During the Relevant Period, Black and Latinx Communities Navigated the Most Significant Risk and Were Hardest Hit by COVID-19 Infection, Illness, and Fatalities**

50.     Despite shared physical susceptibility to infection, the social determinants of health put Black and Latinx New Yorkers at particular risk of COVID-19. In many respects, the COVID-19 pandemic was defined by racial disparities resulting from policy and practice that declared itself universal or denied its racialized impact. These risks persisted even for those who were not essential workers, drivers, or the like, because of the crowded nature of public housing, public hospitals, and public accommodations in communities that are disproportionately Black in New York City.

51.     Recent research has confirmed a reality that was evident and discussed at the time: policy, practice, and procedure that failed to account for structural inequities and foreseeable social determinants of health, and instead prioritized those most likely to benefit, could perpetuate and exacerbate pre-existing systemic injustices, including systemic racism,

racial inequality, and public health risks. *See* Elizabeth Badalov, *et al., COVID-19 double jeopardy: the overwhelming impact of the social determinants of health*, 21 International Journal for Equity in Health 76 (2022). This includes policing policy targeting low-income Black communities.  During the COVID-19 pandemic the foreseeable effects of the social determinants of health were amplified, leaving Black and Latinx people with significantly poorer health prospects and lower prospects of accessing high quality medical care and benefitting from it even when available, resulting in higher mortality rates for minority patients. *Id.*

52.    Even at the time it was clear that Black and Latinx individuals experienced particularly high risk and Black and Latinx communities in New York City have been hardest hit by COVID-19. See NYC Health, *Age adjusted rate due to increased vulnerabilities given a range of fatal lab confirmed COVID-19 cases per 10,000 by race/ethnicity group* (April 6, 2020) available at https://www1.nyc.gov/assets/doh/downloads/pdf/imm/covid-19-deaths-race-ethnicity-04162020-1.pdf (showing 22.8 deaths per 10,000 Hispanic New Yorkers and 19.8 deaths per 10,000 Black New Yorkers in contrast to 10.2 deaths per 10,000 White New Yorkers).

53.    Disproportionately in Black and Latinx communities, people navigated the uncertainty of COVID-19 in the context of commuting to work daily, more severe infections and higher mortality, more crowded housing (including public housing), and strained public hospitals forced to ration treatment during the pandemic. See NYC Comptroller, *New York City's Frontline Workers* (March 26, 2020) available at https://comptroller.nyc.gov/reports/new-york-citys-frontline-workers/ ("75 percent of all frontline workers are people of color, including 82 percent of cleaning services employees. More than 40 percent of transit employees are black while over 60 percent of cleaning workers are Hispanic."); Michael Schwirtz and Lindsey Rogers Cook, *These N.Y.C. Neighborhoods have the Highest Rates of Virus Deaths,* The New

York Times (May 18, 2020) (Neighborhoods with high concentrations of Black and Latino people suffered the highest death rates in New York City); Harald Schmidt, *The Way We Ration Ventilators is Biased*, The New York Times (April 15, 2020) (structural inequality leads to lower baseline health among particular racial and ethnic groups, resulting in a de-prioritization of those patients for ventilators); Yoav Gonen *et al*., *NYC Blacks and Hispanics dying of COVID-19 at twice the rate of Whites, Asians*, The City (April 8, 2020).

54.     In addition, social distancing requirements did not exempt certain "essential workers," like home health aides, nursing home personnel, transit workers, and grocery and delivery personnel, from working outside the home. Yet, their work directly or indirectly decreased the pressure on the healthcare system at the peak of the epidemic in New York City. Most importantly, Black and Latinx people disproportionately fill essential worker roles, working full time and commuting via public transportation. *See* Stringer, *New York City's Frontline Workers*, *supra* at ¶35.

55.     The crisis created by the pandemic in Black and Latinx communities, *i.e.,* the likelihood that racial disparities would characterize infection, severity, and deaths in a pandemic, was foreseeable to the City.  Epidemiologists studying the social determinants of health reported racial disparities related to policy, not susceptibility to contagion, influenced morbidity and mortality from the H1N1 influenza virus, the last viral epidemic.  *See* Sidney Fussell, *The H1N1 Crisis Predicted Covid-19's Toll on Black Americans,* Wired (May 6, 2020) (citing Sandra Crouse Quinn, et al*., Racial Disparities in Exposure, Susceptibility, and Access to Health Care in the US H1N1 Influenza Pandemic,* 101 Am J Public Health 285 (Feb. 2011) *and* Supriya Kumar, Sandra Crouse Quinn, et al., *The Impact of Workplace Policies and Other Social Factors on Self-Reported Influenza-Like Illness Incidence During the 2009 H1N1 Pandemic*, 102 Am J

Public Health 134 (Jan. 2012) (lack of sick leave, greatest among Latinos, is central factor

resulting in H1N1 exposure of five million people).

56.     Understanding of the risks of COVID-19, a novel coronavirus, was still evolving

in April 2020.  Yet, it was becoming clear that even a casual encounter with the police could

have been fatal. In the context of COVID-19, public understanding evolved at exactly the same

rate as scientific understanding. In January 2020, COVID-19 was compared to influenza and

publicly dismissed as a significant concern for the United States. By February 2020, cases were

filtering into the United States, but the virus was seen as primarily a threat to older people and

children were believed to be immune or not susceptible to severe infection. By March 2020,

cases skyrocketed in New York City, but nearly half of American infections included people

under 50 years of age, like Plaintiffs' and their families.

57.     By April 2020, racial disparities in COVID-19 infection, severity, and fatalities

showed that Black and Latinx communities were particularly impacted by COVID-19. *See* NYC

Health, *Age adjusted rate of fatal lab confirmed COVID-19 cases per 10,000 by race/ethnicity

group* (April 6, 2020) available at https://www1.nyc.gov/assets/doh/downloads/pdf/imm/covid-

19-deaths-race-ethnicity-04162020-1.pdf (showing 22.8 deaths per 10,000 Hispanic New

Yorkers and 19.8 deaths per 10,000 Black New Yorkers, in contrast to 10.2 deaths per 10,000

White New Yorkers).  By early May 2020, a rare and previously unseen toxic reaction, pediatric

multi-system inflammatory syndrome ("PMSIS"), began appearing in children, even as New

York City cases decreased. *See* Pam Belluck, *A New Coronavirus Threat to Children,* New York

Times (May 13, 2020) available at https://www.nytimes.com/article/kawasaki-disease-

coronavirus-children.html. The 110 children already diagnosed in New York City were largely

Black and Latinx and some incubated COVID-19 for up to six weeks before developing

symptoms or PMSIS. *See* Anna Sanders, *NYC detects 110 cases of mysterious coronavirus-tied syndrome in children – most are black and Hispanic*, N.Y. Daily News (May 15, 2020) available at https://www.nydailynews.com/coronavirus/ny-coronavirus-syndrome-mystery-children-black-hispanic-new-york-city-20200515-3f7ovpdhhza3ngagquftoaraxy-story.html.

58.     Studies at the time of Plaintiffs' stop and Mr. Jones' arrest fed public concern, anxiety, and understanding. The research at the time already suggested that COVID-19 was far more contagious than initially reported, which ultimately proved true. *See* Jonathan Shaw, *COVID-19 May Be Much More Contagious Than We Thought*, Harvard Magazine (May 13, 2020) available at https://harvardmagazine.com/2020/05/r-nought  (new research suggests each infected person may infect five to six others, *i.e.,* $R^0$ comparable to smallpox); Jessica Flores, *Simply talking in confined spaces may be enough to spread the coronavirus, researchers say*, USA Today (May 13, 2020) available at https://www.rrstar.com/zz/news/20200514/simply-talking-in-confined-spaces-may-be-enough-to-spread-coronavirus-researchers-say. This trajectory confirms serious, unpredictable risk, and a need for the highest level of care with respect to communities particularly at risk.

**NYPD Enforcement of Social Distancing Targeted Black and Latinx Persons**

59.     Citywide, throughout March, April, and May of 2020, the Legal Aid Society confirmed NYPD enforcement of social distancing involved stark racial disparities that cannot not be explained by citizen complaints about social distancing violations. *See* The Legal Aid Society, *Racial Disparities in NYPD's COVID-19 Policing: Unequal Enforcement of 311 Social Distancing Calls*, (May 2020) available at https://legalaidnyc.org/racial-disparities-in-nypds-covid-19-policing/. The Legal Aid Society report found that NYPD responses to 311 complaints for social distancing violations are considerably more likely to result in a summons or arrest in majority Black or Latino precincts. *Id.*  18 of the 20 precincts with the highest rates of known

social distancing arrests or summonses per 10,000 people are in majority Black and Latino precincts but, of the 32,293 social distancing complaints made through 311 between March 28 to May 12, slightly less than half (46.2%) of the complaints concerned violations in majority Black and Latino precincts. *Id*. While four of the five precincts receiving the most social distancing complaints through 311 were in majority-white neighborhoods, four of the five precincts with the most COVID-19 related arrests and summonses were in neighborhoods that are majority Black and Latinx. *Id*. In this vein, 78.9% of summonses and 74.1% of arrests for which the Legal Aid Society was able to identify a precinct occurred in majority Black and Latino precincts. *Id*.

60.     In addition, there was not evidence that NYPD-specific enforcement of social distancing, or conducting low-level stops, was beneficial or effective to public health or safety. NYPD enforcement of social distancing has not proven effective to manage COVID-19 public health or public safety concerns. No evidence suggests these interventions kept the community safer, from viruses or violence. *Compare* Christopher M. Sullivan & Zachary P. O'Keeffe, *Evidence that curtailing proactive policing can reduce major crime*, 1 Nature Human Behavior 737 (2017) available at https://www.nature.com/articles/s41562-017-0211-5 (sharp reductions in proactive policing by NYPD in 2014-2015, including 90%+ drop in summonses accompanied *decreases* in major crime complaints citywide); Sarah Lustbader, *What's Not To Love About The NYPD Slowdown?,* The Appeal (Sept. 3, 2019) available at https://theappeal.org/whats-not-to-love-about-the-nypd-slowdown/ (NYPD work stoppage after Eric Pantaleo was fired showed decrease in summonses and decline in major crime).

61.     In addition, in many NYPD interactions enforcing social distancing, NYPD personnel fail to use personal protective equipment or otherwise protect the health and safety of the citizens with whom they interact. On May 7, 2020, Time reported that in many videos

depicting NYPD social distancing enforcement arrest, officers were not wearing masks or were incorrectly wearing masks. *See* Josiah Bates, *'We Cannot Police Our Way Out of a Pandemic.' Experts, Police Union Say NYPD Should Not Be Enforcing Social Distance Rules Amid COVID-19*, Time (May 7, 2020).

62.     NYPD enforcement of social distancing appears to replicate the racial disparities and racial profiling of low-level encounters, Terry stops, and arrests for offenses like jaywalking or fare evasion. *Compare* Samar Kurshid, *NYPD Continues Move Away from Criminal Penalties for Low-Level Offenses, But Racial Disparities Remain*, The Gotham Gazette (Sept. 4, 2019) ("91% of criminal summonses were given to people of color….Officers continue to use an exception that allows them to give out a criminal summons instead of a civil fine, vaguely citing "law enforcement reason" as a criteria."); Samoylov, M. and Kuntzman, G., *NYPD Targets Blacks and Latinos for 'Jaywalking' Tickets*, StreetsBlogNYC (Jan 8, 2020) (90% of people stopped for jaywalking by NYPD are Black and Latinx; one-third of jaywalking tickets given in the Bronx); Brand, D., *Nearly every single person arrested for weed in NYC this year was Black or Latinx*, Queens Daily Eagle (Aug. 21, 2019) ("Black and Latinx New Yorkers accounted for 94 percent of all low-level marijuana arrests" mirroring "persistent disparities in fare evasion arrests"); Mueller, B., et al., *Surest Way to Face Marijuana Charges in New York: Be Black or Hispanic*, The New York Times (May 13, 2018) (despite NYPD claim racial disparity driven by local complaints, "among neighborhoods where people called about marijuana at the same rate, the police almost always made arrests at a higher rate in the area with more black residents").

63.     At the time, the most visible, and intentional, selective enforcement of social distancing were the jam-packed New York City public parks, where unmasked people in close proximity and in crowds have been evident daily throughout this period. *See e.g.,* Joseph

Goldstein and Corey Kilgannon, *Balmy Weekend Presents a Challenge: New Yorkers Rushing to Parks*, N.Y. Times (May 2, 2020; *Coronavirus Cabin Fever: Crowds Flock To Central Park Even As Social Distancing Enforcement Remains In Effect*, CBS Local N.Y. (April 25, 2020); Jen Carlson, *Photos Show NYC Parks Still Bustling During The Global Pandemic*, Gothamist (Mar. 28, 2020); Sarah Dorn, et al., *People flock to NYC-area bars, beaches as 'quarantine fatigue' intensifies*, N.Y. Post (May 16, 2020). This was explicitly recognized as a racialized selective enforcement in the international media and in the public realm. *See e.g.,* Poppy Nour, *A tale of two cities: how New York police enforce social distancing by the color of your skin,* The Guardian (May 4, 2020) ("outrage has sparked over juxtaposed images that show officers handing out masks to white sunbathers, while another video shows an officer punching a person of color and sitting on him following a dispute about social distancing").

64.     In addition, NYPD did not act to enforce obvious social distancing needs on public transportation inside subway cars and buses, closed systems with particularly attendant risks heavily relied upon by Black and Latinx essential workers to commute daily, even though the executive orders applied to businesses in New York City and affirmed their obligations to mitigate risk in serving customers.  Subways and buses became more crowded as service cuts limited the number of trains and buses running but NYPD enforcement did not acted to protect public health in this context. *See* Christina Goldbaum and Lindsay Rogers Cook, *They Can't Afford to Quarantine. So They Brave the Subway,* The New York Times (Mar. 30, 2020).

65.     Police data also revealed that, during the relevant period, overwhelmingly, NYPD enforcement of social distancing was against Black and Latinx communities and persons. *See e.g.,* Josiah Bates, *Police Data Reveals Stark Racial Discrepancies in Social Distancing Enforcement Across New York City*, TIME (May 8, 2020) (68% of those arrested for social

distancing violations in New York City between March 16 and May 5 were Black and 24% were Hispanic); Ashley Southall, *Scrutiny of Social-Distance Policing as 35 of 40 Arrested are Black,* The New York Times (May 7, 2020) (35 of 40 people arrested for social distancing violations in Brooklyn between March 17 and May 4 were Black, four were Hispanic, and one was white). On May 8, 2020, the Bronx Daily reported on recent social distancing enforcement statistics and embedded a figure depicting the racially disproportionate data. *See* Jonas Bronck, *NYPD COVID-19 Summons Enforcement Data*, The Bronx Daily, (May 8, 2020); *see also* Maya Rajamani, *Vast majority of social distancing summonses in NYC went to black and Hispanic residents*, 1010 WINS (May 8, 2020) available at https://www.politico.com/states/new-york/albany/story/2020/05/08/black-and-latino-new-yorkers-get-vast-majority-of-social-distancing-summonses-1283223.

66.     Citizen journalists, professional reporters, and concerned citizens also came forward to speak out about unjustified police encounters and stops and racial profiling toward Black and Latinx persons in NYPD enforcement of social distancing during the relevant period. On April 3, 2020, the Intercept reported on NYPD enforcement of social distancing, including an NYPD social distancing action in Bedford Stuyvesant, Brooklyn, where police pepper-sprayed a crowd of people in a parking lot. Alice Speri, *NYPD's Aggressive Policing Risks Spreading the Coronavirus,* The Intercept, (April 3, 2020), available at https://theintercept.com/2020/04/03/nypd-social-distancing-arrests-coronavirus/.

67.     Such incidents were widespread in contemporaneous social media reporting as well. On April 10, 2020, a witness to NYPD enforcement of social distancing on a subway platform posted a video depicting NYPD Officers detaining and handcuffing a man who had indicated the subway platform was too crowded to socially distance as directed.  Bystanders

audible in the video implied the escalation to arrest was in retaliation for the use of coarse or vulgar language against the police. This video was posted on Twitter, a public social media platform. *See* Real Justice, @RealJusticePAC, Twitter, (April 10, 2020, 11:31 a.m.), https://twitter.com/RealJusticePAC/status/1248634593638592514.  In another event, on April 11-13 2020, Rebecca Kavanaugh, an attorney admitted to practice in New York State, posted a video involving the "social distancing detention" of a young Black child on a Harlem subway platform, on Twitter, a public social media platform. Rebecca Kavanagh @DrRJKavanagh, Twitter, (April 11, 2020, 10:00 p.m.) https://twitter.com/DrRJKavanagh/status/1249155279293493249, (April 12, 2020, 10:39 a.m.) https://twitter.com/DrRJKavanagh/status/1249346403350044672, and (April 13, 2020, 6:13 a.m.), https://twitter.com/DrRJKavanagh/status/1249641953274331136. The videos depicted the detention of a young Black child on a Harlem subway platform and the eventual arrest of the child's guardian.

68.     On May 2, 2020, in a video posted on Twitter, a public social media platform, there was a heavy police presence in Brownsville, Brooklyn, a Black neighborhood in New York City.  The video depicted multiple NYPD Officers, many of whom were not wearing masks, detaining multiple Black men in Brownsville, Brooklyn. In the video, police enforcing social distancing restrictions, and in the middle of handcuffing one Black man, noticed another Black man walking very slowly toward them in the street, ran up on him, grabbed him by the throat, tackled him to the ground and proceeded to handcuff him. Why Accountability, @WA_tweets, Twitter, (May 3, 2020, 8:41 a.m.) https://twitter.com/WA_Tweets/status/1256926903275061248.

69.     On May 3, 2020, during NYPD enforcement of social distancing in the Lower East Side of Manhattan, in New York City, NYPD Officer Francisco Garcia approached a

bystander, NYCHA employee Donni Wright, while firing his taser and instructing him to move back.  Officer Garcia was not wearing a mask. He approached Mr. Wright, accused him of "flexing" and then immediately tackled Mr. Wright to the ground. He began punching Mr. Wright in the head and body, dragged him on the ground, and kneeled on his head while a fellow officer observed and then assisted in handcuffing Mr. Wright. A video of this incident went viral and is included in this herein referenced article. *See* John Del Signore, *Video: NYPD Officer Beats Bystander, Kneels On His Head During Social Distancing Enforcement*, Gothamist, (May 3, 2020).

70.     On May 3, 2020, Hawk Newsome, the chairperson of Black Lives Matter Greater New York, was pretextually stopped on the claim of social distancing enforcement as he video-recorded police officers in the Melrose area of the Bronx, in New York City.  Although he was walking with only one person and legally video recording the police who were interfering in a funeral service in the Bronx, the officers repeatedly instructed him to disperse.  Mr. Newsome retained six feet of distance from his walking companion. The police officer instructing Mr. Newsome was not wearing a mask.  On May 5, 2020, a video was posted on Instagram, a public social media platform. The video, posted by congressional candidate and witness, Chivona Renée Newsome, newyorkvonni, Instagram, (May 3, 2020), https://www.instagram.com/tv/B_v4RAyHdUu/?utm_source=ig_embed, depicted the arrest of Hawk Newsome who was protesting the NYPD dispersing of a funeral in the Bronx and Ms. Newsome indicated they were recording because the police had pepper sprayed an entire family gathered for a funeral service immediately prior to the video. *See also* Royce Dunmore, *Graphic Videos Show NYPD Terrorizing Same Black Communities Being Killed By Coronavirus*, News One (May 5, 2020) available at https://newsone.com/3936823/videos-show-nypd-terrorizing-

same-black-communities-killed-by-coronavirus/.On May 4, 2020, a video was posted on Twitter, a public social media platform, showed multiple officers detaining, pushing, and approaching people without masks, gloves, or other protective equipment. Why Accountability, @WA_tweets, Twitter, (May 4, 2020, 9:42 p.m.) https://twitter.com/WA_Tweets/status/1257485915112517632.

71.     Such incidents were occurring citywide. On May 4, 2020, a video depicting uniformed officers violently arresting a young Black man showed three officers detaining and punching the young man.  On the apparent guise of social distancing enforcement, the officers repeatedly instructed the bystanders video recording the interaction to go inside.  Eventually, the officer ran warrant checks of the bystanders and the video ends as the officer informs the videographer that he has an I-card and grabs his cell phone. The video was posted on Twitter, a public social media platform. *See* Anthony Beckford (City Council Candidate), @Vote4Beckford, Twitter, (May 4, 2020, 8:39 p.m.), https://twitter.com/Vote4Beckford/status/1257469870524051457. On May 8, 2020, NYPD Officers detained approximately eight young Black adolescent boys forced to kneel up against fence in apparent social distancing enforcement. The videographer narrated and captured the presence of uniformed officers, plainclothes officers, and a white-shirted supervisor. This video was posted on Twitter, a public social media platform. *See* Tariq Nasheed @tariqnasheed, Twitter, (May 8, 2020, 6:21 p.m.), https://twitter.com/tariqnasheed/status/1258884734551113729.

72.     The public service announcements by NYPD also varied by neighborhood in racialized ways. During the same period, in the Nolita neighborhood of Manhattan, NYPD broadcast a friendly reminder from a patrol car cruising the neighborhood on a regular basis to

observe social distancing restrictions.  The announcement says, in sum and substance, "This is the New York City Police Department. Due to the current health emergency, members of the public are reminded to keep a safe distance of 6 feet from others while in public places to reduce the spread of the coronavirus. Please help us keep you safe, thank you for your cooperation." *See also* Olivia Bensimon, *NYPD patrol car plays coronavirus PSA over loudspeaker at NYC park,* N.Y. Post (Mar. 25, 2020) available at https://nypost.com/2020/03/25/nypd-patrol-car-plays-coronavirus-psa-over-loudspeaker-at-nyc-park/.

73.     On the contrary, in Queensbridge, a Twitter user noted that "Cops all over Vernon Boulevard by Queensbridge Projects locking people up for being outside, broadcasting a PSA that they've been ordered to dispersed by @NYGovCuomo" and referenced an attached video showing dozens of police officers occupying the courtyard of Queensbridge Houses, and broadcasting a public service announcement threatening arrest. The public service announcement indicated: "Warning: These gatherings are prohibited. This is the New York City Police Department. Gatherings of any kind have been prohibited by the governor and by the mayor. This gathering is unlawful and you are ordered to disperse. If you fail to disperse immediately, you are subject to arrest." This video was posted on Twitter, a public social media platform. See UpFromTheCracks, @ UpFromTheCracks, Twitter, (May 5, 2020, 10:27 p.m.), https://twitter.com/UpFromTheCracks/status/1257859462288805889?s=20.

74.     Elsewhere in the City, this more threatening PSA was reserved for public protestors gathering in violations of the rules. Upon information and belief, very few of these persons were subject to individual subsequent law enforcement action. *See* Peter Mastrosimone, *De Blasio declares protest to be illegal,* Queens Chronicle (May 21, 2020) available at

https://www.qchron.com/editions/queenswide/de-blasio-declares-protest-to-be-

illegal/article_8b72584b-9b07-5713-af7f-75692bf410b0.html (stating the full text of the PSA).

**NYPD Enforcement of Social Distancing has Involved Frequent Retaliation, Use of Force, and Escalation in Retaliation for Coarse or Vulgar Language**

75.   In several cases, the stress of the Covid-19 pandemic was reflected in police

responses to citizen dissatisfaction. NYPD enforcement of social distancing escalated when

officers retaliated against the legal use of vulgar or coarse language.  For example, on May 5,

2020, NYPD enforcement of social distancing escalated quickly to handcuffing and arrest of a

young [woman] situation was not wearing a face mask. *See* Rebecca Kavanagh

@DrRJKavanagh, Twitter, (May 5, 2020, 2:32 a.m.),

https://twitter.com/DrRJKavanagh/status/1257558718528577538.

76.   On May 13, 2020, Kaleemah Rozier was in the Barclays Center / Atlantic Avenue

subway station with her five-year old child.  They were wearing masks, but had exposed their

noses and mouths as they walked on the stairs.  Ms. Rozier later claimed that "when the police

encountered her, she had lowered her mask to breathe more easily while she climbed the subway

steps and talked on the phone." Woman arrested in subway over mask says police were "all in

the wrong.", New York Times (May 19,2020). As she tried to walk away from officers claiming

to enforce social distancing, the officers confronted her and eventually tackled her to the ground

and forcibly arrested her. Dean Meminger, a news reported for NY1, posted on Twitter, a public

social media platform, a video depicting the arrest of the young woman of color. Dean

Meminger, @DeanMeminger, Twitter, (May 13, 2020, 6:22 p.m.),

https://twitter.com/deanmeminger/status/1260697038565638147.  The video depicts the woman

walking up the steps of the and being arrested by multiple NYPD Officers.

**NYPD did not Enforce Social Distancing Restrictions Against White Communities or People Similarly Situated to Black and Latinx Communities**

77.     Largely, NYPD enforcement of social distancing against white persons and communities was gentle or nonexistent. *See, e.g.*, Poppy Noor, *A tale of two cities: how New York police enforce social distancing by the color of your skin,* The Guardian (May 4, 2020) available at https://www.theguardian.com/world/2020/may/04/coronavirus-new-york-police-enforce-social-distancing ("outrage has sparked over juxtaposed images that show officers handing out masks to white sunbathers, while another video shows an officer punching a person of color and sitting on him following a dispute about social distancing.")

78.     In some predominantly white neighborhoods, like Park Slope, Brooklyn (which includes Prospect Park), large crowds consistently gathering at Prospect Park did not result in NYPD enforcement of social distancing. On May 12, 2020, Patch reported that the largely white neighborhood of Park Slope, Brooklyn had experienced no social distancing arrests. *See* Matt Troutman, Patch Staff, *Not One Social Distancing Ticket For All Of Park Slope: Data*, Patch, (May 12, 2020), available at, https://patch.com/new-york/parkslope/not-one-social-distancing-ticket-all-park-slope-data.

79.     Accounts of harsh tactics in enforcement of social distancing in Black and Latinx communities, including in Plaintiffs' community on the days surrounding the incident that occurred to him, have been contrasted with the gentler approach taken in the Hasidic community in Williamsburg, Brooklyn, *see* Ashley Southall *Scrutiny of Social-Distance Policing as 35 of 40 Arrested Are Black*, New York Times (May 7, 2020) ("Officers issued 12 tickets at a recent funeral that drew a crowd of 2,500") or with respect to crowded public parks in white communities. *See also* Ben Yakas, *Brooklyn Yeshiva Allegedly Caught Holding Classes With At Least 60 Students Inside*, Gothamist (May 18, 2020) (police raid an illegal yeshiva with 100

children inside, in violation of social distancing mandates but "NYPD said no summonses were issued against the people operating the school.").

80.     This includes in mourning ceremonies exactly analogous to the circumstances presented in this case, i.e., the unexpected death of a valued community member. During the same period, NYPD monitored or dispersed banned vigils and mourning gatherings in other, non-Black communities without force, violence, citations, or arrests. *See e.g.,* Jason Silverstein, *Hundreds of Hasidic Jews gather in Brooklyn for rabbi's funeral, defying social distancing order*, CBS News (Apr. 7, 2020) (noting dispersal of multiple funerals in Hasidic communities involving "hundreds of mourners" in New York City in March and April of 2020 using loudspeaker announcements and post hoc statements and without any force, violence, or arrests).

81.     This was true throughout the City, including in neighborhoods with smaller public spaces, where people were more concentrated. For example, on May 2, 2020, a photo was posted on Twitter, a public social media platform. *See* Jeremiah Moss @jeremoss, Twitter, (May 2, 2020, 6:41 p.m.), https://twitter.com/jeremoss/status/1256715403188998146. The photo depicted NYPD Officers distributing masks to predominantly white individuals in Washington Square Park. Another photo posted that same day by NYPD itself depicted a white woman being handed a mask by an NYPD Officer. *See* NYPD NEWS, @NYPDnews, Twitter, (May 2, 2020, 3:15 p.m.), https://twitter.com/nypdnews/status/1256663527479279617. On the same day, a photo depicting a large and congested crowd of predominantly white individuals failing to maintain social distancing or wear mask at Christopher St. Pier was published. *See* Welcome2theBronxTM, @Welcome2theBX, Twitter, (May 2, 2020, 9:52 p.m.), https://twitter.com/Welcome2theBX/status/1256763447209066496. Eventually, on May 8, 2020, Gothamist reported that limitations would be put in place to stem the flow of large gatherings in

some public parks. Ben Yakas, *NYPD Will Limit How Many People Can Enter Hudson River Park and Domino Park*, Gothamist, (May 8, 2020).

**New York City and State Officials Suggested the Improprieties of the NYPD Enforcement of Social Distancing Were Well-Known or Foreseeable**

82.     Brooklyn Borough president, Eric Adams, noted New York's social distancing mandates nowhere set forth criminal conduct: "the enforcement of social distancing is not a crime and we should stop treating it like a crime. It's reculturing. It's rethinking how we have to exist in a COVID, or any virus-like, environment." *See* Jarrett Murphy, *Eric Adams Says Cops Should Not Enforce Social Distancing,* City Limits (May 7, 2020) available at https://citylimits.org/2020/05/07/eric-adams-says-cops-should-not-enforce-social-distancing/.

83.     On May 8, 2020, the New York Daily News reported outrage by New York City public officials upon learning of the racially disproportionate social distancing arrests in New York City. *See* Anna Sanders and Rocco Parascandola, '*That's abysmal': NYC politicians outraged after NYPD reveals 81 percent of social distancing arrests have been minorities*, New York Daily News, (May 8, 2020).

84.     Some public officials reacted by indicating their unwillingness to participate in the police-led misconduct. On May 11, 2020, Gothamist reported on the decision of District attorneys in New York City to decline to prosecute social distancing arrests. *NYC District Attorneys Won't Prosecute Social Distancing Arrests Ordered By De Blasio*, Jake Offenhartz, Gothamist, (May 11, 2020).

85.     Other public officials used their platforms to amplify the unconstitutional and racialized impact of the policy of NYPD enforcing social distancing. On May 13, 2020, New York City Comptroller, Scott Stringer, wrote on Twitter, a public social media platform: "Inhumane. A young child watching their mother slammed to the ground. There is no possible

justification for this. Let me say this AGAIN — the NYPD cannot be involved in social distancing enforcement." See  Scott Stringer, @NYCComptroller, Twitter, (May 13, 2020, 10:39 p.m.), https://twitter.com/NYCComptroller/status/1260761717866475521 (emphasis in original).

**Statements and Actions of NYPD and City Leadership Show Deliberate Indifference to Public Concerns About Racially Disparate Policing by NYPD Officers**

86.     The NYPD officers involved in NYPD enforcement of social distancing included uniformed and plainclothes officers. *See e.g.,* Kim Bellware, *Violent arrest in New York raises questions about police enforcement of social distancing orders*, The Washington Post (May 5, 2020) ("Shea has said there's no "hard and fast rule" on how or even whether plainclothes officers should aggressively enforce social distancing"). As a matter of course, they had graduated from the police academy, and received training in appropriate police encounters, the *de Bour* levels, and permissible stops, questions, and frisks. *See* NYPD Monitor, *Training*, available at http://nypdmonitor.org/training. Yet the City, the NYPD, and individual officers showed deliberate indifference despite repeated, real-time notice of the selective enforcement, racial profiling, targeting of Black and brown communities, and use of force rampant during this period. Instead, it consciously chose not to rectify or address the situation.

87.     On May 8, 2020, Gothamist reported on then-Mayor Bill de Blasio's dismissive response to recent disproportionate social distancing enforcement. *See* Jake Offenhartz *De Blasio Shrugs Off Leaked Data Showing Massive Racial Disparities In NYPD's Social Distancing Arrests*, Gothamist, (May 8, 2020).

88.     The then-NYPD Commissioner also rationalized police misconduct and violence, blamed the people being stopped, suggested additional context would have neutralized public concern, and claimed they were largely criminals. *See* Jake Offenhartz, *Police Commissioner Says It's "Dangerous" To Criticize NYPD For Social Distancing Enforcement Disparities*,

Gothamist (May 13, 2020). At the time, when challenged regarding the stark racial disparities in

stops and summonses issued for social distancing violations, NYPD actually began promoting a

statistic that 90% of those arrested for actual crime during the COVID-19 pandemic were Black

or Latinx, implying the race of these crime suspects justified racially discriminatory policing,

and racial disparities in stops, in Black and Latinx communities. *See* Anthony M. DiStefano,

*COVID-19-related arrests in the city not racially motivated, NYPD says,* Newsday (May 12,

2020) (Legal Aid Society notes the "NYPD definition of 'COVID-related' in this data set is

meaningless. Most importantly, it shed no light on the critical question of how the NYPD can

explain and begin to address its pattern of racially discriminatory enforcement of social

distancing….").

   89. Throughout the COVID-19 crisis, police misconduct was publicly defended,

rather than addressed, by police leadership. *See e.g., Coronavirus News: Mom arrested after

subway confrontation with NYPD over mask*, Eyewitness News 7 (May 14, 2020) available at

https://abc7ny.com/viral-video-violent-arrest-kaleema-rozier-nypd/6196707/ ("We are confident

that the police officers in this incident acted appropriately and with respect," the [NYPD] said.

"This individual was arrested only after her behavior toward officers warranted police action.");

Michael R. Sisak, *Violent Arrest Raises Concerns About NYPD Distancing Patrols*, The

Associated Press (May 3, 2020) ("Police spokeswoman Sgt. Mary Frances O'Donnell said

Wright 'took a fighting stance against the officer' when he was ordered to disperse"); Kathleen

Culliton, *Punching Isn't Excessive Force, NYPD Commissioner Says*, Patch (May 6, 2020)

available at https://patch.com/new-york/new-york-city/punching-isnt-excessive-force-nypd-

commissioner-says (NYPD Commissioner Dermot Shea stated publicly, "A punch should not be

assumed to be excessive force.").

90.     On May 13, 2020, NYPD then-Commissioner Shea spoke at a Mayor's Press Availability, and refused to consider any possibility of racial discrimination among the police: "I will push back strongly on any notion that this is business as usual for the NYPD or that this is 'racist police.' I think this could not be anything further from the truth. Let's remember, we are a minority-majority police department – fact." Shea also suggested current racial profiling claims were merely creations of the media: "I would urge caution to everyone now to honestly, before a press conference is held on a ten second video of a street brawl in the middle of the day in Brooklyn in broad daylight, by the way, before it's turned into an agenda for a press conference." See *Transcript: Mayor de Blasio Holds Media Availability*, May 13, 2020, available at https://www1.nyc.gov/office-of-the-mayor/news/344-20/transcript-mayor-de-blasio-holds-media-availability.

91.     On May 13, 2020, Police Commissioner Dermot Shea also responded to a question during Mayor Bill De Blasio's daily briefing and stated:

> We have issued a small number of summonses, even fewer arrests tied to COVID. Are they mostly to minority members of this city? Yes, they are. And I think you knew that answer before you asked the question, but no one is talking about the disparity of the last ten homicide victims in New York City, and I think that should be spoken about or the victims of robberies across the city. Disparities exist in every facet of life, not just in New York City but in this country and it's rooted in much deeper issues than the New York City Police Department.

*Transcript: Mayor de Blasio Holds Media Availability*, May 13, 2020, available at https://www1.nyc.gov/office-of-the-mayor/news/344-20/transcript-mayor-de-blasio-holds-media-availability. *See also* Craig McCarthy, *Dermot Shea defends NYPD after racism claims over social-distancing stops*, New York Post (May 13, 2020) (NYPD Commissioner offered "an extremely heated rant" dismissing claims of racism and offering broad, racialized justifications

for NYPD misconduct: "they fight when they go to court, they have open gun cases, they are gang members, and we expect our police officers to do the best they can.").

92.     In addition, there has been no clear and transparent guidance with respect to NYPD enforcement of social distancing as it rolled out, in operation, and in the current claim of a partial rollback.  *See e.g.,* Kim Bellware, *Violent arrest in New York raises questions about police enforcement of social distancing orders,* The Washington Post (May 5, 2020) ("Shea has said there's no "hard and fast rule" on how or even whether plainclothes officers should aggressively enforce social distancing").

93.     Nevertheless, the severity of the risk, and the attendant anxiety this created, involved was clear and known to the CITY OF NEW YORK, which fired some court personnel and other City employees who declined vaccinations once available.

**Selective enforcement, racial profiling, and the misconduct set forth in this case have been declared improper and unconstitutional existing 'policy or practice' of the City in the Southern District of New York**

94.     Notably, this misconduct was already prohibited in New York City and NYPD was under judicial oversight for racial profiling in police stops and searches. *Floyd, et al. v. City of New York* challenged the NYPD's practice of racially profiling and unconstitutionally stopping and frisking New York City residents. In the nine-week Floyd trial, Judge Shira Scheindlin of the Southern District of New York heard evidence of the NYPD's stop-and-frisk practice, and its particular impact on young Black and Latinx men. The court found that the NYPD's policies and practices were unconstitutional and racially discriminatory, and it detailed a set of remedies to bring those practices into constitutional compliance.  *See Floyd v. City of New York*, 959 F.Supp.2d 540 (S.D.N.Y 2013) (Liability Opinion) *and see Floyd v. City of New York*, 959 F.Supp.2d 668 (S.D.N.Y 2013) (Remedies Opinion).

95.     Since 2013, the plaintiffs in *Floyd*, and a companion cases regarding NYPD racial profiling in NYCHA public housing, *Davis v. City of New York*, 10-CV-0699 (AT) (S.D.N.Y.), have been engaged in a remedial process with the NYPD and a court-appointed Monitor. The remedial process intended to create broad, systemic change is ongoing. This includes initial revisions to the NYPD Patrol Guide regarding its stop-question-and-frisk policy, widespread retraining, and other remedial efforts to reform these unconstitutional practices.

96.     In that case, the court-appointed Monitor's Ninth Status Report, filed in January 2020, was the last update prior to Plaintiffs' encounter with NYPD. That report detailed particular issues regarding NYPD officers' significant underreporting of the stop-and-frisks that they conduct, a widespread failure on the part of NYPD supervisors to detect and take corrective action regarding unconstitutional stops-and-frisks conducted by subordinate officers, as well as ongoing problems with the NYPD's systems for disciplining officers who commit misconduct during stops, and auditing the constitutionality of officer stop-and-frisk activity.[1]  Even changes in the language of policy and procedure had not necessarily disrupted these racial profiling and racialized policies and practices.

97.     Despite allegedly updating its policy regarding stops, questions, frisks, searches, and the use of force, and participating in considerable training in this regard, significant racial disparities persist in enforcement in Black and Latinx communities, particularly in public housing in New York City.

98.     Upon information and belief, NYPD supervisors continued dismissing, ignoring, or justifying selective enforcement, racial profiling, and other practices reflecting consistent misconduct throughout the relevant period, including to pressure patrol officers to heavily police

---

[1] *Floyd, et al. v. City of New York*, 08-CV-1034 (AT), Dkt.# 680 (S.D.N.Y. Jan. 11, 2019).

Black communities during the pandemic. These unconstitutional and unlawful practices persist within a context of impunity, and the continued expectation of impunity, as high-level investigations have made clear that the NYPD fails to discipline patrol officers accused of misconduct, even when complaints are substantiated by the Civilian Complaint Review Board ("CCRB"). *See generally*, Mary Jo White, *The Report of the Independent Panel on the Disciplinary System of the New York City Police Department* (Jan. 25, 2019).

99. Defendants' conduct, including in these ongoing unlawful policies and practices, caused Plaintiffs to suffer loss of liberty, physical, emotional, and psychological pain, anxiety, loss of sleep, stress, embarrassment, fear, humiliation, and deprived him of his constitutional rights.

## KNOWN, ONGOING, AND CONTINUING VIOLATIONS

100. The allegations set forth herein represent knowing, voluntary, continuing, and ongoing violations of Plaintiff's civil rights. These ongoing violations are not arising from one particular incident, but a continuing context and the ongoing custom, practice, or policy of the NYPD and NYCHA that facilitate common law and statutory violations of civil rights. The continuing violations doctrine is based on the continuation of unlawful acts, which in this case occurred at least throughout the relevant period and may continue even today.

101. The police misconduct toward Plaintiffs occurred in a continuous, known, and ongoing context of regular, repeated and frequent police harassment and violence in his community. Defendant Dym and his colleagues were frequently in the vicinity and the source of the harassment, unlawful stops and searches, and abuses of authority. In April 2020, Mr. Murphy was at the location where he was arrested collecting reports about ongoing and upticks in police harassment in the community. One person they knew, Roland Elliott had approached the police

initially to ask why they were harassing the mourners at the vigil for the child who had died and was immediately attacked and assaulted. His son was beaten and arrested within twenty-four hours of his own arrest. Several of his son's friends were harassed, beaten, and arrested on that same day. Others they knew were walking in the public streets and sidewalks or near their own buildings when the police approached, stopped, and harassed and assaulted them without suspicion or probable case.

102.   On several occasions, throughout the relevant period, Mr. Murphy and Mr. Jones observed people just standing together outside in the community and later observed the police jump out on them, instructing them to go home or upstairs and stating that they cannot be outside and threatening trespass arrests. Throughout the relevant period, the police would disperse any group of people in the community, telling people they cannot be outside, and that they need to be upstairs. Defendant Dym and his squad were frequently in the area, approaching and harassing people without cause or suspicion, and violence and other abuses of authority would regularly ensue.

103.   On frequent occasions throughout the relevant period, Plaintiffs observed the police, including Defendant Dym and his colleagues, come into the community, round everyone up who was standing in groups outside in the courtyards and outside areas, arrest and transport them to PSA7, where they would later be released with a desk appearance ticket. These abuses of authority rarely came to the attention of the courts as the community members could appear in the DAT Part only months later or, frequently, fail to appear and receive a bench warrant. This behavior continued throughout the relevant period, consistently in the Mott Haven Houses and the surrounding neighborhood.

104.     Thus, prior to and subsequent to his April 2020 arrest, Plaintiffs witnessed and experienced numerous acts of police harassment, misconduct, violence, and abuse of authority in his community. These abuses were perpetuated in the same ways, often by the very same officers, and no complaints or reporting deterred or served to catalyze accountability, reform, or a limit to the expectation of impunity. The most robust reform ever conducted has occurred in the context of the *Floyd v. New York City* litigation and even now, no oversight authority believes that all NYPD stops, frisks, and searches are being recorded, accurately described, or effectively improving more legality in Black and Latinx communities, including Plaintiff's. *See e.g.,* Arun Venugopal, *Federal monitor: NYPD is not reporting all stop and frisk cases,* Gothamist (May 8, 2022).

105.     The repeal of NY Civil Rights Law §50-a has created transparency and clarity as to the ubiquity and intentionality of the knowing, continuing violations Plaintiff experienced at the hands of the Defendants. Similarly, the "bad cops list" issued by the District Attorneys of each county offered more clarity in the courts. *See e.g.,* George Joseph, *Bronx Prosecutors Release Secret Records On Dishonest Cops,* Gothamist (Oct. 7, 2019). At least one of the NYPD officers involved, Lt. Eric Dym, was known for ongoing misconduct and brutality, and ongoing impunity, in NYCHA properties and their environs relating to PSA 7, until his retirement in October 2022.

106.    This and other credible claims of ongoing misconduct at PSA 7 and in the Mott Haven area evidence of Plaintiff's credible claims of the continuing and ongoing violations of constitutional rights that he, his family, and others in the community were experiencing on an ongoing basis. In addition, the many complaints, disciplinary reviews, and other indicia of the ongoing misconduct experienced by Plaintiff (including litigation, media reports, independent agency and inspector general reports, and more) suggest Individual Defendants' and Defendant NEW YORK CITY's disregard for the rights of Plaintiffs and those in their community. It also shows that the disregard of NYPD's misconduct – was knowing and intentional, or at least reckless.

## SURVIVORSHIP ACTION

107.    Since the events set forth herein, and unrelated to the events set forth in this complaint, Plaintiff Levar Jones has died. Until the time of his death, Defendants' conduct, including in these ongoing unlawful policies and practices, caused Mr. JONES' to suffer losses of liberty, physical, emotional, and psychological pain, anxiety, loss of sleep, stress, embarrassment, fear, humiliation, and deprived him of his constitutional rights. Mr. JONES' dependents allege violations of Mr. JONES' civil rights, claims predicated upon violations of Mr. JONES' Constitutional rights and 42 U.S.C. §1983. Mr. JONES leaves behind dependents and persons, including Plaintiff Katyria Giler Colon, and her minor children, who reasonably expected to receive future support from him

## COMPLIANCE WITH NEW YORK GENERAL MUNICIPAL LAW

108.    By and through counsel, Harvey Murphy timely served a Notice of Claim upon the City of New York via eClaim on June 25, 2020, within the tolling period set forth by New York State Executive Orders 202.67 and 202.8. He received Claim Number 2020-PI-01520.

109.    On December 10, 2020, Mr. Murphy attended an examination pursuant to New York General Municipal Law § 50-h.

110.    More than thirty days have elapsed since Plaintiff served his Notice of Claim and the City has not offered adjustment or payment of his claim.

111.    By and through counsel, Levar Jones timely served a Notice of Claim upon the City of New York via eClaim on June 25, 2020, within the tolling period set forth by New York State Executive Orders 202.67 and 202.8. He received a Claim Number 2020-PI-015204.

112.    On December 10, 2020, Mr. Jones attended an examination pursuant to New York General Municipal Law § 50-h.

113.    More than thirty days have elapsed since Plaintiff served his Notice of Claim and the City has not offered adjustment or payment of his claim.

## CLAIMS FOR RELIEF

### First Claim for Relief
**Violations of the Fourth, Fifth, and Fourteenth Amendments,
U.S. Const. Amend. IV, V, XIV, 42 U.S.C. § 1983**

114.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

115.    In committing the acts and omissions complained of herein, the CITY OF NEW YORK, and Defendants NYPD OFFICERS Eric S. Dym, and JOHN DOES 1-10 ("Individual Defendants") acted under color of state law to deprive Plaintiffs of certain constitutionally protected rights under the Fourth Amendment to the United States Constitution, including, but not limited to:

      a.   the right to be free from selective enforcement of the law

      b.   the right to be free from unreasonable search and seizure;

   c.   the right to be free from arrest without probable cause;

   d.   the right to be free from use of excessive force;

   e.   the right to be free from false imprisonment, that being wrongful detention without good faith, reasonable suspicion, or legal justification, and of which detention Plaintiff was aware and to which he did not consent;

   f.   the right to be free from the lodging of false criminal charges against him by police officers;

   g.   the right to be free from wrongful prosecution; and

   h.   the right to equal protection, privileges, and immunities under the laws.

116.    In committing the acts and omissions complained of herein, Defendants breached their affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence.

117.    The City has acted with deliberate indifference to the Fourth, Fifth, and Fourteenth Amendment rights of Plaintiffs. As a direct and proximate result of the acts and omissions of the City, Plaintiffs have been deprived of rights under the Fourth Amendment to the United States Constitution and 42 U.S.C. § 1983.

118.    As a direct and proximate result of Defendants' deprivation of Plaintiffs' constitutional rights, Plaintiffs suffered the injuries and damages set forth above.

119.    The unlawful conduct of the Individual Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

**Second Claim for Relief**
**Violations of the Equal Protection Clause**
**U.S. Const. Amend. XIV, 42 U.S.C. § 1983**

120.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

121.    In committing the acts and omissions complained of herein, CITY OF NEW YORK, and Defendants NYPD OFFICERS Eric S. Dym, and JOHN DOES 1-10 ("Individual Defendants") acted under color of state law to deprive Plaintiffs of certain constitutionally protected rights.

122.    Acting under color of state law, Defendants have selectively applied enforcement practices against all Plaintiffs and those in their community, intentionally discriminatory and race-based manner. Defendants have focused enforcement and harsh and unlawful enforcement practices in African-American and Latinx communities.

123.    Defendants have targeted communities of color, particularly in proximity to NYCHA Residences, for selective enforcement, as residents in-and visitors to-these buildings are inhabited almost entirely by African Americans and Latinos. This pattern of targeted enforcement is evident even when controlling for other factors, like the COVID-19 pandemic.

124.    Defendants have acquiesced in, ratified, and/or failed to check widespread violations of Plaintiffs' constitutional rights to be free from unreasonable searches and seizures, because of Plaintiffs' race.

125.    These constitutional abuses were, and are, directly and proximately caused by policies, practices, and/or customs devised, implemented, enforced, encouraged, and/or sanctioned by the City, including: (a) targeted implementation of COVID-19 and social distancing enforcement in communities of color; (b) the discriminatory failure to adequately and properly screen, train, support, and/or supervise NYPD officers deployed in communities of color; and (c)

44

the discriminatory failure to adequately and properly monitor, investigate and/or discipline NYPD officers engaged in racial bias and discrimination.

126.   In committing the acts and omissions complained of herein, CITY OF NEW YORK, and Defendants NYPD OFFICERS Eric S. Dym, and JOHN DOES 1-10 ("Individual Defendants")  acted under color of state law to deprive Plaintiffs of certain constitutionally protected rights under the Fourth, Fifth, and Fourteenth Amendment to the United States Constitution, including, but not limited to:

    a.  the right to be free from selective enforcement of the law

    a.  the right to equal protection under the law and due process of law

    b.  the right to be free from unreasonable search and seizure;

    c.  the right to be free from arrest without probable cause;

    d.  the right to be free from use of excessive force;

    e.  the right to be free from false imprisonment, that being wrongful detention without good faith, reasonable suspicion, or legal justification, and of which detention Plaintiff was aware and to which he did not consent;

    f.  the right to be free from the lodging of false criminal charges against him by police officers and;

    g.  the right to equal protection, privileges, and immunities under the laws.

127.   In committing the acts and omissions complained of herein, Defendants breached their affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence.

128.   As a direct and proximate result of Defendants' deprivation of Plaintiffs' constitutional rights, Plaintiffs suffered the injuries and damages set forth above.

129.    'The unlawful conduct of the Individual Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

**Third Claim for Relief**
**42 U.S.C. § 1983**
**Violations of Plaintiff's Fourth and Fourteenth**
**Amendment Rights (_Monell_)**

130.    Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

131.    The unconstitutional conduct of the Individual Defendants was directly and proximately caused by _de facto_ policies, practices, and/or customs devised, implemented, enforced, encouraged, and sanctioned by the City whereby written policies are ignored in practice in favor of _de facto_ policies.

132.    Defendant CITY OF NEW YORK developed and maintained customs, policies and practices exhibiting deliberate indifference to the constitutional rights of its citizens, including but not limited to the right to be free from racial discrimination, to the right to be free selective enforcement of the law, and to the right to be free racial bias by public officials, which caused the violations of Plaintiffs' rights.

133.    It was a custom, policy, and/or practice of the City to selectively enforce the law with respect to public health and other restrictions during the COVID-19 pandemic individuals, particularly Black individuals, without reasonable suspicion.

134.    It was a custom, policy, and/or practice of the City to enable, license, or disregard as agents of the City selectively enforced the law in certain communities, particularly those public housing communities heavily populated by Black and Latinx individuals, like Mott Haven Houses, without reasonable suspicion.

135.     During the relevant period, it was a custom, policy, and/or practice of the City to disproportionately surveil, stop, question, and frisk, issues summons to and/or arrest, and use force against Black and Latinx individuals on pretextual grounds, and without reasonable suspicion, including in public housing, in the early months of the COVID-19 pandemic.

136.     During the relevant period, the CITY OF NEW YORK continued to pressure officers to intervene in public health and mental health related scenarios, for which police intervention may be unwarranted, harmful and unsuited to the issues at hand and for which these officers are neither properly trained nor ably equipped.

137.     The CITY OF NEW YORK have developed and maintained a culture of deliberate indifference, and impunity, with respect to best practices for constitutional and non-biased encounters. Defendants have created a *de facto* NYPD policy of selective enforcement, harassment, and control.

138.     The CITY OF NEW YORK has developed and maintained this culture of indifference and impunity with respect to police encounters with Black New Yorkers despite foreseeable and known enhanced risk to these individuals in the early months of the COVID-19 pandemic.

139.     The CITY OF NEW YORK have failed to properly train NYPD officers on best practices for constitutional and non-biased encounters, particularly in uncertain and emergency times, and to properly supervise its officers to ensure that they are implementing these best practices.

140.     The CITY OF NEW YORK caused the deprivation of the constitutional rights of Black New Yorkers in communities targeted for selective enforcement, which was a reasonably foreseeable consequence of, and substantially caused by, the municipality's failure to supervise

COVID-19 enforcement, and the activities of individual members of service during the COVID-19 pandemic.

## Fourth Claim for Relief
### Violation of Due Process under the Fourteenth Amendment to the U.S. Constitution

141.   Plaintiffs realleges and incorporates by reference each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

142.   Defendants' selective enforcement practices, as written and as applied, throughout the relevant period, violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution, by authorizing and causing NYPD officers to unlawfully stop, seize, question, frisk, search, use force, and/or arrest individuals, thus depriving Plaintiffs of their right to liberty as well as their rights to freedom of association, freedom of assembly, and intimate association, in the absence of constitutionally required procedural protections.

143.   The violation of rights alleged herein include through the initiation and pursuit of criminal charges against Plaintiffs, members of their families, and members of their communities. These charges that have directly resulted in the arrest or detention of Plaintiffs, members of their families, and members of their communities. By enforcing the law selectively and via unlawful and unconstitutional policies and practices, Defendants intentionally and under color of law have denied all Plaintiffs their right to due process of law, in violation of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

## Fifth Claim for Relief
### Violations of the New York State Constitution

144.   Plaintiff realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

145.    Such conduct breached the protections guaranteed to Plaintiffs by the New York State Constitution, including but not limited to, Article 1, §§ 1, 6, 11, and 12, and including the following rights:

      a.   freedom from unreasonable search and seizure of his person and property;

      b.   freedom from arrest without probable cause;

      c.   freedom from use of excessive force;

      d.   freedom from false imprisonment, that being wrongfully detained without good faith, reasonable suspicion, or legal justification, and of which wrongful detention Plaintiff was aware and did not consent;

      e.   freedom from the lodging of false charges against him by police officers, including on information and belief, by some or all of the individual Defendants;

      f.   freedom from wrongful prosecution; and

      g.   the right to equal protection under the laws.

146.    As a direct and proximate result of Defendants' deprivations of Plaintiffs' rights, privileges, and immunities guaranteed by the New York State Constitution, Plaintiffs suffered the injuries and damages set forth above.

147.    At all relevant times, the Individual Defendants were employees of the City and were acting within the scope of their employment.

148.    The City is therefore vicariously liable under the doctrine of *respondeat superior* for the actions of the Individual Defendants set forth herein.

### Sixth Claim for Relief
### False Arrest and False Imprisonment

149.    Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

150.     The Individual Defendants, through the foregoing acts, caused Plaintiffs to be wrongfully detained and arrested without good faith, reasonable suspicion, or legal justification. Plaintiffs were aware of this detention and did not consent.

151.     Individual Defendants committed the foregoing acts intentionally, wilfully, and with malicious disregard for Plaintiffs' rights and are therefore liable for punitive damages.

152.     At all relevant times, the Individual Defendants were employees of the City and were acting within the scope of their employment.

153.     The City is therefore vicariously liable under the doctrine of *respondeat superior* for the actions of the Individual Defendants set forth herein.

## Seventh Claim for Relief
### Assault and Battery

154.     Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

155.     The Individual Defendants, through the foregoing acts, without just cause or consent, wilfully and maliciously used harmful and/or offensive physical force against Plaintiffs to arrest him and placed him in apprehension of imminent harm.

156.     Individual Defendants committed the foregoing acts intentionally, wilfully, and with malicious disregard for Plaintiffs' rights and are therefore liable for punitive damages.

157.     At all relevant times, the Individual Defendants were employees of the City and were acting within the scope of their employment.

158.     The City is therefore vicariously liable under the doctrine of *respondeat superior* for the actions of the Individual Defendants set forth herein.

### Eighth Claim for Relief
### Intentional Infliction of Emotional Distress

159.     Plaintiffs' reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

160.     The Individual Defendants, through the foregoing acts, did commit extreme and outrageous conduct and thereby intentionally, and/or recklessly caused Plaintiffs to experience severe mental and emotional distress, pain, suffering, and damage to name and reputation.

161.     The Individual Defendants committed the foregoing acts intentionally, wilfully, and with malicious disregard for Plaintiffs' rights and are therefore liable for punitive damages.

162.     At all relevant times, the Individual Defendants were employees of the City and were acting within the scope of their employment.

163.     The City is therefore vicariously liable under the doctrine of *respondeat superior* for the actions of the Individual Defendants set forth herein.

### Ninth Claim for Relief
### Negligence

164.     Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

165.     The Individual Defendants owed Plaintiffs a duty of care, including the duty to exercise due care in the course of their duties as NYPD officers and the duty to protect citizens from the intentional misconduct of other NYPD officers.

166.     The Individual Defendants, through the foregoing acts, negligently failed to use due care in the performance of their duties in that they failed to perform their duties with the degree of care that a reasonably prudent and careful officer would have used under similar circumstances.

167.    All of these acts were performed without any negligence on the part of Plaintiffs and were the proximate cause of the injuries to Plaintiffs, their families, and their community.

168.    At all relevant times, the Individual Defendants were employees of the City and were acting within the scope of their employment.

169.    The City is therefore vicariously liable under the doctrine of *respondeat superior* for the actions of the Individual Defendants set forth herein.

**Tenth Claim for Relief**
**Negligent Hiring, Training, and Supervision**
**Under State Law**

170.    Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

171.    The City and NYCHA are liable to Plaintiffs because of its intentional, deliberately indifferent, careless, reckless, and/or negligent failure to adequately hire, train, supervise, and discipline its agents, servants, and/or employees employed and/or the NYPD with regard to aforementioned duties.

**Eleventh Claim for Relief**
**Violation of the New York State**
**Human Rights Law**

172.    Plaintiffs realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

173.    Defendants have discriminated, and continue to discriminate, against Plaintiffs, their families, and their community on the basis of race, ethnicity, and/or national origin in the terms, conditions, or privileges of the sale, rental, or lease of a housing accommodation, or in the furnishing of facilities or services in connection therewith, in violation of the New York State Human Rights Law, N.Y. Exec. Law § 290 et seq.

174.    Defendants have also discriminated, and continue to discriminate, against Plaintiffs, their families, and their community  on the basis of race, ethnicity, and/or national origin in the terms, conditions, or privileges of publicly-assisted housing accommodations, or in the furnishing of facilities or services in connection therewith, in violation of the New York State Human Rights Law, N.Y. Exec. Law § 290 et seq.

175.    By the actions described above, Defendants have engaged in, and continue to engage in, a policy, pattern, and practice of discrimination against African-American and Latino residents of minority communities like Mott Haven, due to their race, ethnicity, and/or national origin-or the racial composition of their building-in violation of the New York State Human Rights Law, N.Y. Exec. Law § 290 et seq.

176.    Plaintiffs, their families, and their community have been and continue to be harmed by Defendants' violations of the New York State Human Rights Law.

### Twelfth Claim for Relief
### Violation of the New York City
### Human Rights Law

177.    Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

178.    Defendants have discriminated, and continue to discriminate, against Plaintiffs, their families, and their community on the basis of race, ethnicity, and/or national origin in the terms, conditions, or privileges of the sale, rental, or lease of a housing accommodation, or in the furnishing of facilities or services in connection therewith, in violation of the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101 et seq.

179.    Defendants have also discriminated, and continue to discriminate, against Plaintiffs, their families, and their community on the basis of race, ethnicity, and/or national origin in the terms, conditions, or privileges of publicly-assisted housing accommodations, or in

the furnishing of facilities or services in connection therewith, in violation of the New York State Human Rights Law, N.Y. Exec. Law § 290 et seq.

180.     By the actions described above, Defendants have engaged in, and continue to engage in, a policy, pattern, and practice of discrimination against African-American and Latino residents of Black and Latinx communities like Mott Haven due to their race, ethnicity, and/or national origin – or the racial composition of their buildings – in violation of the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101 et seq.

181.     Plaintiffs, their families, and their community have been and continue to be harmed by Defendants' violations of the New York City Human Rights Law.

## DEMAND FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this Court order the following relief against the Defendants, jointly and severally:

182.     Declare that Defendants' acts, practices, policies, and/or omissions have deprived Plaintiffs of their rights under the Fourth and Fourteenth Amendments to the United States Constitution; 42 U.S.C. § 1981; Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000(d); the Constitution and laws of the State of New York; and the New York City Human Rights Law;

183.     Order all appropriate injunctive relief as warranted, including, but not limited to:

(a)     enjoining Defendants immediately to cease their violation of Plaintiffs' rights, and to remedy the invidious effects of their violations in NYCHA Residences, including effectuating trespass stops and arrests in a lawful, reasonable, and nondiscriminatory manner;

(b)     enjoining Defendant City from dismissing, disregarding, or justifying misconduct, by refraining to conduct discipline, including in matters referred thereto by

CCRB for disciplinary measures, and creating and sustaining a culture of impunity for members of service enforcing policy and practice; and

(c)      enjoining Defendants to submit for the review of Plaintiffs and the Court a protocol detailing lessons learned and revisions in policy and practice to substantially reduce the risk of unjustified stops, frisks, searches, detentions, and false arrests of NYCHA residents, their visitors, and other persons lawfully on the premises of NYCHA Residences in times of emergency like the COVID-19 pandemic.

184.    Award compensatory damages in an amount just and reasonable;

185.    Award punitive damages to the extent allowable by law;

186.    Order reasonable attorneys' fees and costs to be paid by Defendants pursuant to 28 U.S.C. § 2414 and 42 U.S.C. §§ 1988, 3613; and;

187.    The costs and disbursements of this action;

188.    Interest; and

189.    Grant such other and further relief as this Court deems just and equitable.

Dated: New York, New York
       March 7, 2023

DAYLIGHT | RULE OF LAW •
ACCESS TO JUSTICE • ADVOCACY LLC
21 Cleveland Place, Ste. 5B
New York, NY 10012
Tel. (917) 832-5937


By:   /s/ Dominique Day
         Dominique Day

         *Attorney for Plaintiffs*