UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  03/04/2024
```

HARVEY MURPHY and KATYRIA GILER
COLON, on behalf of herself and her minor
children, N.J. and K.J.,

                          Plaintiffs,

                -against-

THE CITY OF NEW YORK, a municipal entity;
NEW YORK CITY POLICE DEPARTMENT
OFFICER LT. ERIC S. DYM, sued in his
individual and official capacities; NYPD Officer
Shawn Moynihan, Shield No. 03202, sued in his
individual and official capacities; NYPD Officer
Victor Carrasquillo, Shield No. 16720, sued in his
individual and official capacities; NEW YORK
CITY POLICE DEPARTMENT OFFICERS JOHN
DOES 1-10, all of whom are sued in their
individual and their official capacities,

                       Defendants.

23 Civ. 1925 (AT)

**<u>ORDER</u>**

ANALISA TORRES, District Judge:

       Plaintiffs, Harvey Murphy and Katyria Giler Colon, bring this action against Defendants, the

City of New York and New York City Police Department ("NYPD") officers Eric S. Dym, Shawn

Moynihan, Victor Carasquillo, and John Does 1-10, alleging that Defendants discriminatorily

enforced the City's COVID-19 social-distancing policies against Black and Latinx communities.

They bring claims for (1) violations of the Fourth, Fifth, and Fourteenth Amendments of the

Constitution, under 42 U.S.C. § 1983; (2) analogous violations of the New York State Constitution;

and (3) various common-law torts, including false arrest and imprisonment, assault and battery, and

intentional infliction of emotional distress.  Am. Compl. ¶¶ 160–222, ECF No. 30.  Defendants move

to dismiss all claims, except Murphy's excessive force claim against Moynihan and Carasquillo,

pursuant to Federal Rules of Civil Procedure 12(b)(1) and (b)(6).  ECF No. 58; *see* Def. Mem., ECF

No. 60.  For the following reasons, Defendants' motion is GRANTED in part and DENIED in part.

# BACKGROUND[1]

## I.     Factual Background

### A.  Events of April 9, 2020

On April 9, 2020, Harvey Murphy, a community organizer, was meeting with residents in the Mott Haven Houses, a public housing development in the Bronx, about "complaints of police harassment . . . since the COVID-19 pandemic had begun."  Am. Compl. ¶¶ 44–45.  Mott Haven resident Levar Jones was also in the area, attending a vigil for a neighborhood child who had recently died.  *Id.* ¶ 46.  The two men met up and walked down the street together, maintaining physical distance; Jones, who had diabetes and was fearful of COVID-19 infection, wore an N95 mask.  *Id.* ¶ 47.  They observed two plainclothes police officers "driving slowly in an unmarked car, staring and slowly starting to follow them," and they each pulled out their cell phones to record.  *Id.* ¶¶ 48–49.  Although the amended complaint does not state the names of the officers, Defendants' brief identifies them as Shawn Moynihan and Victor Carrasquillo.  *See* Def. Mem. at 11 (referring to "the subject incident involving P.O.s Moynihan and Carrasquillo and [P]laintiffs").[2]

The officers, who were not wearing masks, jumped out of the car and "ran up on the two men."  Am. Compl. ¶ 50.  One officer approached Murphy, grabbed his cell phone, began pushing him, and threw his phone to the ground.  *Id.* ¶ 51.  The officer then put his hand on his gun and told Murphy to back up.  *Id.*

The other officer approached Jones, shoved him, threw his phone to the ground and tried to step on it, and restrained him.  *Id.* ¶ 52.  The officer grabbed Jones's chain necklace and pulled him to the ground.  *Id.*  The first officer then joined in and began to assault Jones, "throwing him on the

---

[1] The following facts are taken from the complaint, which the Court accepts as true for purpose of this motion. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

[2] The complaint also states that Eric S. Dym was "involved in the stop, harassment, initiation and persistence of the use of force, and the arrest."  Am. Compl. ¶ 67.

pavement by his neck and punching and striking him multiple times as he was on the ground." *Id.*
The officers pepper-sprayed both Murphy and Jones; the spray ran into Jones's N95 mask, making it
"hard to breathe." *Id.* ¶¶ 52–54.

The officers handcuffed Jones and forced him into the police car, where he lost consciousness.
*Id.* ¶ 55.  He awoke at the police station ("PSA7"), the N95 mask filled with pepper spray still
covering his face.  *Id.* ¶ 56.  The officers at PSA7 refused his repeated requests to wash off the pepper
spray.  *Id.* ¶¶ 58–59.

After some time, Jones was taken to a hospital.  *Id.* ¶ 60.  A nurse asked the officer
accompanying Jones to remove one of the handcuffs so that she could take Jones's vital signs, but the
officer refused.  *Id.*  In the emergency room, the plainclothes officer "snatched the mask from []
Jones' face and said, 'Now you're going to die.'"  *Id.* ¶ 61.  Jones remained in the emergency room,
unmasked, for two hours until a nurse provided him another mask.  *Id.* ¶ 62.

A doctor at the hospital discharged Jones without speaking to or treating him, and the officer
took Jones back to PSA7, where he was released around 1:00 a.m.  *Id.* ¶¶ 64–65.  The officers refused
to provide Jones their names and "told him to leave before they arrested him again."  *Id.*

Jones was charged with disorderly conduct, obstruction of governmental administration, and
resisting arrest, in violation of New York Penal Law Sections 240.20, 195.05, and 205.30,
respectively.  *Id.* ¶ 66.  The case was ultimately dismissed.  *Id.*

Jones has since died from causes unrelated to the events at issue in the case.  *Id.* ¶ 153.  The
amended complaint states that Plaintiff Katyria Giler Colon and "her minor children, his direct issue,"
are "real parties in interest" because they "were supported by [] Jones" and "reasonably expected to
receive future support from him."  *Id.*

B.  City Policies and Practices

Plaintiffs allege that Jones and Murphy "were just two of many Mott Haven Houses residents and people in the vicinity of the Mott Haven Houses harassed, illegally stopped and searched, and experiencing the unlawful use of force" during the COVID-19 pandemic, from March 2020 to October 2022. *Id.* ¶¶ 21, 69.  They claim that their unlawful treatment by the NYPD on April 9, 2020, resulted from the City's "use of NYPD to enforce COVID-19 social distancing policy." *Id.* ¶ 74.  According to Plaintiffs, "the City selectively enforced COVID-19 restrictions, often with a particular punitive, carceral, and force-ridden approach for Black and Brown New Yorkers and in Black and Latine communities in the City." *Id.* ¶ 76.  At the same time, Plaintiffs allege, "NYPD enforcement of social distancing against white persons and communities was gentle or nonexistent." *Id.* ¶ 98.  Plaintiffs allege that the Defendants' actions amount to "a *de facto* policy and practice, and/or unofficial custom of selective enforcement, harassment, surveillance, violence, and arrests" in the relevant period. *Id.* ¶ 7.

Plaintiffs further allege that Dym, Moynihan, and Carrasquillo (the "Individual Defendants"), "and their colleagues at PSA7[,] were an ongoing driver of police misconduct and brutality in the PSA7 service area." *Id.* ¶ 135.  They claim that the Individual Defendants "were frequently in the vicinity and the source of the harassment, unlawful stops and searches, and abuses of authority." *Id.* ¶ 143.[3]  And, they argue, the City knew or should have known of the Individual Defendants' abuses of authority, but failed to take steps to "disclose or eradicate their misconduct." *Id.* ¶ 135.

Murphy and Jones each served a Notice of Claim on the City on June 25, 2020, and attended examinations on December 10, 2020. *Id.* ¶¶ 154–159.  Plaintiffs filed this action on March 7, 2023,

---

[3] Dym was subject to twenty-eight CCRB complaints, resulting in fifty-six substantiated allegations of misconduct, and at least fourteen lawsuits alleging misconduct. *Id.* ¶ 117.  Moynihan was subject to fifteen complaints resulting in nine substantiated allegations, and at least six lawsuits.  ¶ 118.  And Carrasquillo has been subject to six CCRB complaints resulting in five substantiated allegations, and at least one lawsuit. *Id.* ¶ 119.

and amended their complaint to add Moynihan and Carrasquillo as defendants on May 26, 2023.

ECF Nos. 1, 30.

**DISCUSSION**

I.  Rule 12(b)(1)

    A.  Legal Standard

An action should be dismissed pursuant to Rule 12(b)(1) where it is apparent that the court

lacks subject matter jurisdiction—that is, the statutory or constitutional power—to adjudicate it.  *See*

Fed. R. Civ. P. 12(b)(1); *Thomas v. Metro. Corr. Ctr.*, No. 09 Civ. 1769, 2010 WL 2507041, at *1

(S.D.N.Y. June 21, 2010).  Challenges to a plaintiff's standing are addressed under Rule 12(b)(1).

*See Liberian Cmty. Ass'n of Conn. v. Lamont*, 970 F.3d 174, 184 (2d Cir. 2020).

"A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance

of the evidence that it exists." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).  A

district court must consider a challenge to subject matter jurisdiction before addressing other grounds

for dismissal.  *Rhulen Agency, Inc. v. Ala. Ins. Guar. Ass'n*, 896 F.2d 674, 678 (2d Cir. 1990).  On a

Rule 12(b)(1) motion, the Court must accept all material factual allegations as true.  *J.S. ex rel. N.S. v.*

*Attica Cent. Schs.*, 386 F.3d 107, 110 (2d Cir. 2004).  It may not, however, "draw

inferences . . . favorable to [the] plaintiff[]" on such a motion.  *Id.*  And, the Court may consider

evidence outside the pleadings to resolve disputed factual issues relating to jurisdiction.  *See id.*

    B.  Proper Plaintiffs

First, Defendants argue that Colon and her minor children are not "real parties in interest"

under Federal Rule of Civil Procedure 17(a)(1), and therefore "lack standing to proceed as plaintiffs."

Def. Mem. at 5.  Rule 17(a) requires that "[a]n action . . . be prosecuted in the name of the real party

in interest"; in other words, "only a person who possesses the right to enforce a claim and who has a

significant interest in the litigation can bring the claim." *Cortlandt St. Recovery Corp. v. Hellas*

5

*Telecomms., S.a.r.l*, 790 F.3d 411, 420 (2d Cir. 2015) (cleaned up).  "The purpose of the rule is to prevent multiple or conflicting lawsuits by persons such as assignees, executors, or third-party beneficiaries, who would not be bound by res judicata principles."  *Id.* at 421 (quotation marks and citation omitted).

In general, a "[§] 1983 civil rights action is a personal suit and may not be brought by a relative, even the parents, spouse or children of the individual whose civil rights were violated." *Black v. Petitinato*, No. 16 Civ. 2320, 2018 WL 1115692, at *2 (E.D.N.Y. Feb. 27, 2018), *aff'd*, 761 F. App'x 18 (2d Cir. 2019).  "When a party dies before pursuing his cause of action under § 1983," however, "the claim survives for the benefit of his estate if applicable state law creates a right of survival."  *Barrett v. United States*, 689 F.2d 324, 331 (2d Cir. 1982).  Under New York law, a § 1983 claim survives a party's death "and may be asserted by his personal representative."  *Id.* (citing N.Y. Est. Powers & Trusts L. § 11–3.2(b)); *see also Garmon v. Cnty. of Rockland*, No. 10 Civ. 7724, 2013 WL 541380, at *4 (S.D.N.Y. Feb. 11, 2013).[4]

Colon has not alleged that she is Jones's personal representative—only that she and her children "were supported by [] Jones" and "reasonably expected to receive future support from him." Am. Compl. ¶ 153.  Plaintiffs argue that New York law cannot bar Colon and her children from proceeding on Jones's behalf because it "fails to encompass Section 1983's goals to deter future abuses of power and protect constitutional rights."  Pl. Opp. at 26 n.6, ECF No. 66.  But, the Second Circuit has held otherwise.  *See Barrett*, 689 F.2d at 331.  Accordingly, the Court must DISMISS Colon as a plaintiff in this action.

"Courts have the power to allow substitution when a mistake has been made in naming the plaintiff, including failure to prosecute in the name of the real party in interest."  *Fletcher v. City of*

---

[4] The same rule also applies to Colon's New York constitutional and common-law tort claims.  *Cf. Palladino v. Metro. Life Ins. Co*., 590 N.Y.S.2d 601, 602 (App. Div. 1992) (under New York law, "[o]nly a duly appointed personal representative may bring suit on behalf of a decedent").

*New London*, No. 16 Civ. 241, 2017 WL 690533, at *4 (D. Conn. Feb. 21, 2017) (citing Fed. R. Civ.

P. 17(a)(3)).  Plaintiffs may move for leave to amend their complaint with facts showing that Colon—

or another party—is Jones's personal representative, permitting them to assert claims on his behalf.

### C.  Standing for Injunctive Relief

Next, Defendants argue that Murphy lacks standing to sue for injunctive relief.  When seeking

injunctive relief against a municipality, a plaintiff has standing only if he can "carry the burden of

establishing that 'he has sustained or is immediately in danger of sustaining some direct injury as the

result of the challenged official conduct.'"  *Shain v. Ellison*, 356 F.3d 211, 215 (2d Cir. 2004)

(quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 101–102 (1983)).  This requires a plaintiff to

show "both a likelihood of future harm and the existence of an official policy or its equivalent."  *Id*. at

216 (emphasis omitted) (citing *Lyons*, 461 U.S. at 105–106).  Defendants contend that Murphy can

show neither.  Def. Mem. at 18–22.

As discussed further below, the Court finds that Murphy has adequately alleged the second

prong of the *Shain* test, the existence of an official policy or its equivalent.  *See An v. City of New

York*, 230 F. Supp. 3d 224, 229 n.1 (S.D.N.Y. 2017) (collecting cases that hold that a showing of

official policy for the purposes of municipal liability is sufficient for *Shain* and *Lyons*).  His ability to

pursue equitable relief, therefore, turns on whether he has alleged a likelihood of future harm—that

is, whether he has alleged that he is "realistically threatened by a repetition of his experience . . . or

whether the claim is speculative."  *Curtis v. City of New Haven*, 726 F.2d 65, 67 (2d Cir. 1984)

(citation and quotation marks omitted).

In *Medina v. City of New York*, for example, NYPD officers allegedly placed a plaintiff in a

chokehold, repeatedly tased him, and pulled his pants down to search him—all because he was

listening to loud music at a car dealership in Washington Heights.  No. 19 Civ. 412, 2020 WL

7028688, at *1–3 (S.D.N.Y. Nov. 30, 2020).  The plaintiff brought a § 1983 lawsuit seeking

injunctive relief against the City, alleging deliberate indifference in failing to "train, supervise, investigate, and discipline its officers to prevent the kinds of constitutional violations" he experienced.  *Id.* at \*4.  He argued that a "a real and immediate threat of future injury exist[ed] because, among other things, 'he continues to engage in the lawful conduct that brought him in contact with the NYPD—listening to music and barbequing with friends outdoors.'"  *Id.* at \*5.  But the district court found these allegations "too speculative and conjectural" to confer standing.  *Id.* The court also rejected the plaintiff's argument that his "subjective fear" of the police after the incident established standing: under *Lyons*, the court held, the plaintiff needed to point to "objective criteria indicating that the recurrence of the unlawful conduct is relatively likely to occur."  *Id.* at \*6.

The complaint here similarly falls short of fulfilling *Shain*'s first prong.  Murphy does not allege that he will likely be stopped, searched, or harassed by the police in the future for purportedly violating the City's COVID-19 social distancing policies (or for any other reason).  Indeed, the complaint confines its allegations of misconduct to the "relevant period," which it defines as the period "from March 2020 to October 2022."  Am. Compl. ¶ 21; *cf. Liberian Comm. Ass'n*, 970 F.3d at 184–85 (holding that plaintiffs failed to plead a likely risk of future quarantining where the Ebola quarantine policy at issue had since been revised).  Murphy also alleges that the "climate of fear" created by Defendants' misconduct "impacted his everyday actions, including his willingness and capacity to be out in public."  *Id.* ¶ 133.  But, this "subjective fear" does not establish that "the recurrence of the unlawful conduct is relatively likely to occur."  *Medina*, 2020 WL 7028688, at \*6.

Murphy also argues that the City's continuing failure to discipline officers who have engaged in misconduct, and its decision to reconstitute the NYPD's "Anti-Crime Unit, disbanded as reform after the chokehold death of Eric Garner," establish a "likelihood of suffering future similar misconduct."  Pl. Opp. at 28; *see* Am. Compl. ¶¶ 126-32.  Although these allegations may support an inference that incidents of misconduct will continue to occur throughout the city, they do not bear on

the relevant inquiry—whether Murphy has alleged a "likelihood that *he* will again be wronged in a similar way." *Shain*, 356 F.3d at 216 (emphasis added) (quoting *Lyons*, 461 U.S. at 111).

Accordingly, the City's motion to dismiss Murphy's claims for injunctive relief is GRANTED.

II.   Rule 12(b)(6)

A.  Legal Standard

To withstand a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*.  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*.  Legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not entitled to a presumption of truth. *Id*.  On a motion to dismiss, the Court must draw all reasonable inferences in the non-movant's favor. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

B.  Statute of Limitations

Defendants argue that all of Murphy's state common-law and constitutional claims are time-barred by New York General Municipal Law § 50-i.[5]  Def. Mem. at 22–24.  That section provides that "any action against a municipality for injury to person or property by reason of the negligence or wrongful act of any of its officers, agents or employees must be commenced within one year and ninety days of the event complained of." *Taylor v. Mayone*, 626 F.2d 247, 252 (2d Cir. 1980).  "New

---

[5] "Although the statute of limitations is ordinarily an affirmative defense that must be raised in the answer, a statute of limitations defense may be decided on a Rule 12(b)(6) motion if the defense appears on the face of the complaint." *Thea v. Kleinhandler*, 807 F.3d 492, 501 (2d Cir. 2015) (citation omitted).

York courts have held that the one-year-and-ninety-day statute of limitations applies to claims not only against municipalities themselves, but also against 'any officer, agent, or employee thereof,' if the municipality is required to indemnify the defendant." *Conte v. Cnty. of Nassau*, 596 F. App'x 1, 5 (2d Cir. 2014) (quoting N.Y. Gen. Mun. L. § 50-i) (citation omitted).

On March 20, 2020, then-Governor Andrew Cuomo issued Executive Order 202.8, which tolled the statute of limitations in New York in light of the COVID-19 pandemic.  9 N.Y.C.R.R. § 8.202.8.  Subsequent orders extended the tolling period until November 3, 2020.  Exec. Order 202.72 (Nov. 3, 2020).

Murphy does not dispute that his claims accrued on April 9, 2020, the day of the incident. Nor does he dispute that—including the COVID-19 tolling period—he did not file his complaint within the one-year-and-ninety-day statute of limitations governing his state-law claims.  He argues, however, that he has alleged "continuing violations," including "*de facto* discriminatory policy and ongoing deliberate indifference."  Pl. Opp. at 22–23.

The "continuing violation" exception to the standard accrual date of a claim arises when "there is evidence of an ongoing . . . policy or practice."  *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 713 (2d Cir. 1996).  "[T]he existence of such a continuing . . . practice or policy may delay the commencement of the statute of limitations period 'until the last [] act in furtherance of it.'" *Harris v. City of New York*, 186 F.3d 243, 248 (2d Cir. 1999) (quoting *Gomes v. Avco Corp.*, 964 F.2d 1330, 1333 (2d Cir. 1992)).  To survive a motion to dismiss based on a statute of limitations, "the claimant must allege both the existence of an ongoing policy . . . and some non-time-barred acts taken in furtherance of that policy."  *Id.* at 250.

"New York's continuing tort doctrine does not extend the limitations period for [all] continuing pattern[s] of tortious conduct, but rather is limited to certain recognized torts that involve continuing harm."  *Lucas v. Novogratz*, No. 01 Civ. 5445, 2002 WL 31844913, at *7 (S.D.N.Y. Dec.

10

18, 2002).  The Court's first task, therefore, is to determine which of the challenged claims could involve "continuing harm," as opposed to "discrete torts."  *Id.*

Murphy's claim for false arrest and imprisonment cannot be salvaged under the continuing violation doctrine.  *See* Am. Compl. ¶¶ 149–53.  "While false arrest and imprisonment *are* recognized as continuing torts, their continuity is restricted to the period of actual restraint"—for Murphy, the day of the allegedly unconstitutional stop.  *Lucas*, 2002 WL 31844913, at *7.  His claim for assault and battery is also time-barred, as "[c]auses of action for assault and battery accrue immediately upon the occurrence of the tortious act and thus, are not appropriate for the continuing violation exception." *Canosa v. Ziff*, No. 18 Civ. 4115, 2019 WL 498865, at *8 (S.D.N.Y. Jan. 28, 2019) (citation omitted); *see* Am. Compl. ¶¶ 154–58.  Similarly, Murphy's claims for intentional infliction of emotional distress ("IIED"), negligence, and abuse of process—which are premised on the actions of the Individual Defendants—arise from the April 9 incident, making them unfit for the exception.[6]  *See* Am. Compl. ¶¶ 159–169.  And, although Murphy suggests that these claims should be subject to equitable tolling, *see* Pl. Opp. at 23-25, the Court cannot find that Defendants "conceal[ed]" their alleged misconduct that day such that Murphy was unable "to discover the facts underlying his cause of action."  *Cerbone v. Int'l Ladies Garment Workers' Union*, 768 F.2d 45, 48 (2d Cir. 1985).

Murphy's fifth claim, which largely mirrors his federal equal-protection claim, alleges various violations of his rights under the New York Constitution.  Am. Compl. ¶¶ 144–48.  Most of these violations relate specifically to the events of April 9, 2020, alleging that Defendants breached Murphy's right to be free from (a) unreasonable search and seizure, (b) arrest without probable cause,

---

[6] Murphy argues that these torts constitute continuing violations because, after the April 9 incident, he continued to witness arbitrary stops, arrests, and harassment of Mott Haven residents.  Pl. Opp. at 23.  Even assuming that Murphy would have standing to bring claims based on these incidents, however, the incidents are "separate and distinct acts that imposed separate harms . . . [e]ven if they were committed pursuant to a common scheme [or] plan."  *Lucas*, 2002 WL 31844913, at *7.  "Commission of a second tort . . . later does not extend the statute of limitations period for an earlier tortious act."  *Id.*

(c) excessive force, (d) false imprisonment, (e) the lodging of false charges, and (f) wrongful prosecution. *Id.* ¶ 145.  The Court finds that these acts, "if wrongful, constituted discrete torts," requiring Murphy to file the action within the limitations period. *Lucas*, 2002 WL 31844913, at *7. Murphy also alleges, however, that Defendants denied him "the right to equal protection under the laws." Am. Compl. ¶ 145(f).  The Second Circuit has applied the continuing violation doctrine to equal protection claims where a plaintiff alleges "an ongoing policy of discrimination" and "some non-time-barred acts taken in furtherance of that policy." *Lucente v. Cnty. of Suffolk*, 980 F.3d 284, 309 (2d Cir. 2020) (quotation marks and citation omitted).  This claim—which is not specifically tied to the events of April 9—may, therefore, qualify for the exception.

In his tenth claim, for "negligent hiring, training, and supervision," Murphy alleges that the City is liable because of its "failure to adequately hire, train, supervise, and discipline its agents, servants, and/or employees employed and/or the NYPD." Am. Compl. ¶ 171.  Read in the light most favorable to Plaintiff, this claim is not tethered to Murphy's mistreatment on April 9, but alleges continuing harm resulting from the City's negligent employment practices.

The Court's next task is to determine whether the complaint alleges a "continuing pattern and practice of actionable behavior" with respect to Murphy's claims for equal protection under the state constitution and negligent hiring, training, and supervision. *Lucas*, 2002 WL 31844913, at *7.  The Court finds that it does not.  On the negligent hiring, training, and supervision claim, Murphy alleges "a widespread failure on the part of NYPD supervisors to detect and take corrective action regarding unconstitutional stops-and-frisks conducted by subordinate officers." Am. Compl. ¶ 33.  On the equal protection claim, he alleges that "Defendants have targeted Black and Latine communities, particularly in proximity to NYCHA [housing developments], for selective enforcement"—a "pattern of targeted enforcement [that] was an ongoing and continuing violation of" Murphy's, Jones', and others' constitutional rights. *Id.* ¶ 169.  These statements and others in the complaint "can be

12

construed to allege that [the City] has [] continuous polic[ies] and practice[s]" of (1) negligent supervision of NYPD officers, and (2) selective, race-based enforcement of the COVID-19 social distancing laws. *Harris*, 186 F.3d at 250. But, Murphy has not alleged any discriminatory act against him, resulting from these policies and practices, "that did occur within the statute of limitations, so that his claim would not be time-barred." *Id.*

Defendants' motion to dismiss Murphy's state common-law and constitutional claims as time-barred is, therefore, GRANTED as to claims five, six, seven, eight, nine, ten, and eleven.

### C. Personal Involvement by Dym

Defendants contend that Murphy has not alleged that Dym was personally involved "in the subject incident," requiring his dismissal as a defendant.[7] Def. Mem. at 6–7. "To establish a Section 1983 violation, a plaintiff must plead (and later prove) that each defendant was personally involved in the alleged constitutional violation." *Wiggins v. Griffin*, 86 F.4th 987, 996 (2d Cir. 2023). A defendant cannot be held vicariously liable under § 1983 for employing or supervising an employee that violated the plaintiff's rights; rather, a plaintiff must plead "that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (quoting *Iqbal*, 556 U.S. at 676).

The complaint alleges that Dym was "involved in the stop, harassment, initiation and persistence of the use of force, and the arrest." Am. Compl. ¶ 67. It further alleges that Dym was "frequently in the area" of Mott Haven, "approaching and harassing people without cause or suspicion, and violence and other abuses of authority would regularly ensue." *Id.* ¶ 144. And, it states Murphy and Jones frequently observed Dym (and the other Individual Defendants) "come into the community, round everyone up who was standing in groups outside in the courtyards and outside

---

[7] Defendants do not dispute that Moynihan and Carrasquillo—the other Individual Defendants—were personally involved in the April 9, 2020 incident, so the Court does not address whether the complaint adequately alleges their involvement.

areas, arrest and transport them to PSA7, where they would later be released with a summons or a desk appearance ticket." *Id.* ¶ 145.

Drawing all inferences in Murphy's favor, the complaint plausibly alleges Dym's personal involvement in the events of April 9, 2020.  Although the complaint does not set forth Dym's specific actions on that day, "such specificity . . . is not required where, as here, the complaint gives each defendant fair notice of what the plaintiff's claim is and the ground upon which it rests." *Buari v. City of New York*, 530 F. Supp. 3d 356, 390 (S.D.N.Y. 2021) (cleaned up); *see also Paul v. City of New York*, No. 16 Civ. 1952, 2017 WL 4271648, at *4 (S.D.N.Y. Sept. 25, 2017) (denying motion to dismiss where, although the complaint did not "consistently specify exactly which officer did what," the allegations "impl[ied] that all of the Individual Defendants . . . were at least present at the scene and witnessed the events").

Defendants' motion to dismiss the claims against Dym is, therefore, DENIED.

### D.  Equal Protection

Defendants next argue that Murphy has failed to state a claim for violations of the Equal Protection Clause of the Fourteenth Amendment because he has not identified "any similarly situated protagonists at the time of the subject incident."  Def. Mem. at 7–8.

As the Second Circuit has explained, however, there are "several ways for a plaintiff to plead intentional discrimination that violates the Equal Protection Clause."  *Brown v. City of Oneonta*, 221 F.3d 329, 337 (2d Cir. 2000).  Plaintiffs can assert that "they were treated differently than an identifiable, similarly situated group of individuals for malicious reasons, including but not limited to racial prejudice"—called a "selective enforcement" or *LeClair* claim.  *Doe v. Vill. of Mamaroneck*, 462 F. Supp. 2d 520, 543 (S.D.N.Y. 2006) (citing *LeClair v. Saunders*, 627 F.2d 606 (2d Cir. 1980)).  A plaintiff can also assert a "class of one" claim: that they "were intentionally treated differently from others similarly situated and that there was no rational basis for this difference in treatment."  *Id.*

(citing *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)).  To allege either a *LeClair* or *Olech* claim, a plaintiff must identify a "comparator who received more favorable treatment from the defendants."  *Hu v. City of New York*, 927 F.3d 81, 91 (2d Cir. 2019).  An *Olech* claim "requires an extremely high degree of similarity between a plaintiff and comparator," while a *LeClair* claim requires a "reasonably close resemblance."  *Id.* at 93 (quotation marks omitted).  Given this inquiry's "fact-intensive nature," the Circuit has "cautioned against deciding whether two comparators are similarly situated on a motion to dismiss."  *Id.* at 97.

The complaint identifies two groups of white New Yorkers that Murphy alleges were treated differently than the Mott Haven community: (1) Hasidic Jews gathered for a funeral in Williamsburg who were dispersed by NYPD "without force, violence, citations, or arrests," and (2) "predominantly white neighborhoods, like Park Slope, Brooklyn" that "experienced no social distancing arrests."  Am. Compl. ¶¶ 99–101.  The Court finds that the first group passes the *LeClair* "reasonably close resemblance" bar, if barely.  Murphy alleges "differential treatment by the same defendant [(the City)] for the same conduct" (gathering for a memorial during social distancing).  *Hu*, 927 F.3d at 97; *see* Am. Compl. ¶ 46 (alleging that Jones was in the vicinity for a vigil).  However, the complaint does not allege an "extremely high degree of similarity between" the groups gathered in Mott Haven and Williamsburg, as required to state an *Olech* claim.  Nor do Murphy's statistics about lax enforcement in predominantly white neighborhoods allege a comparator with the requisite specificity for either type of claim.  *See Hu*, 927 F.3d at 101 ("[S]tatistics cannot substitute for specific comparators in *Olech* or *LeClair* claims.")

There is also a third type of equal protection claim—a *Pyke* claim—that does not require a plaintiff to "show a better treated, similarly situated group of individuals of a different race."  *Pyke v. Cuomo*, 258 F.3d 107, 110 (2d Cir. 2001).  These claims involve a plaintiff who "alleges that a facially neutral law or policy has been applied in an intentionally discriminatory race-based manner."

*Id.* In these cases, a similarly-situated-group requirement is unnecessary "because the Government's differential treatment of the target group [can] otherwise be clearly demonstrated" using, for example, "statistical evidence." *Doe*, 462 F. Supp. 2d at 545–46. "The *Pyke* analysis implicitly recognizes that a government that sets out to discriminate intentionally in its enforcement of some neutral law or policy will rarely if ever fail to achieve its purpose." *Id.* at 546.

The Court finds that the complaint adequately alleges a violation of equal protection under *Pyke*; namely, that Defendants enforced the City's facially neutral social-distancing policies in an "intentionally discriminatory and race-based manner" against "African-American and Latine communities." Am. Compl. ¶ 168; *see, e.g.*, *id.* ¶¶ 21, 71, 76. Murphy supports these allegations with studies finding that, for example, New York "ZIP codes with higher percentages of lower income and Black residents experienced disproportionately high rates of policing during the COVID-19 pandemic in the name of public health." *Id.* ¶ 72; *see also, e.g.*, *id.* ¶ 104 (news article stating that "81 percent of social distancing arrests have been minorities"). Murphy "will, of course, be required to substantiate [his] claim" that Defendants were at least in part "motivated by racial discrimination." *Pyke*, 258 F.3d at 110. At this early stage, however, Defendants' motion to dismiss the equal-protection claims is DENIED, except to the extent that Murphy seeks to rely on a "class-of-one" *Olech* theory.

E.  Due Process

Defendants also move to dismiss Murphy's claim for violations of due process under the Fourteenth Amendment. Def. Mem. at 8; Am. Compl. ¶¶ 188–90. In his response brief, he clarifies that he is asserting a substantive due process violation based the officers' "outrageous, egregious, [and] shocking" treatment of him and Jones on April 9, 2020. Pl. Opp. at 12–13 (citing *Velez v. Levy*, 401 F.3d 75, 93 (2d Cir. 2005)). The Court agrees that the officers' conduct, if proven, "shocks the conscience." *Velez*, 401 F.3d at 93. But, "[w]here another provision of the Constitution provides an

16

explicit textual source of constitutional protection, a court must assess a plaintiff's claims under that explicit provision and not the more generalized notion of substantive due process." *Id.* at 94 (quoting *Kia P. v. McIntyre*, 235 F.3d 749, 757–58 (2d Cir. 2000)).  Here, because all of Murphy's constitutional claims are "covered" under the Fourth or Fifth Amendment or the Equal Protection Clause, the Court finds that he does not have an additional substantive due process cause of action under the Fourteenth Amendment. *Holland v. City of New York*, 197 F. Supp. 3d 529, 548 (S.D.N.Y. 2016); *see also Velez*, 401 F.3d at 94 (holding that plaintiff's substantive due process claim was either "subsumed in her more particularized [First Amendment and Equal Protection Clause] allegations, or must fail").  Defendants' motion to dismiss the standalone due process claim is, therefore, GRANTED.

### F.   Municipal Liability

Finally, Defendants argue that Murphy has failed to allege facts sufficient to state a cause of action against the City under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).  Def. Mem. at 9–18.  A *Monell* claim has five elements: "(1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury." *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008).  "The fifth element has two separate requirements: a plaintiff must plausibly allege both the existence of a municipal policy and that the policy caused (i.e., was the 'moving force' behind) plaintiff's injury." *Medina*, 2020 WL 7028688, at *6 (quoting *Roe*, 542 F.3d at 37).  The "official policy" requirement "may be met by 'a practice so persistent and widespread, or permanent and well settled, as to constitute a custom or usage with the force of law and to imply the constructive knowledge of policymaking officials,' or by 'a failure to train or supervise subordinates amounting to deliberate indifference to the rights of those with whom the municipality's employees come into

contact." *Id.* (cleaned up) (quoting *Felix v. City of New York*, 344 F. Supp. 3d 644, 653 (S.D.N.Y. 2018)).

The complaint relies on both theories.  First, Murphy alleges that the NYPD's practice of "target[ing] Black and Latine persons" in its enforcement of social-distancing restrictions was "so widespread as to have the force of law."  Am. Compl. at 28 & ¶¶ 79–95.  Murphy cites various sources supporting his claim, including a May 2020 Legal Aid Society report finding that most "COVID-19 related arrests and summonses were in neighborhoods that are majority Black and Latine," despite more complaints to New York's 311 hotline coming from predominantly white neighborhoods, and NYPD data showing that "68% of those arrested for social distancing violations in New York City between March 16 and May 5 were Black and 24% were Hispanic."  *Id.* ¶¶ 79, 86; *see also id.* ¶ 113 (then-Police Commissioner, discussing summonses and arrests "tied to COVID": "Are they mostly to minority members of this city? Yes, they are.").  He also illustrates his claims with contemporaneous news articles and social media posts depicting violent stops, arrests, and detentions for alleged social-distancing violations.  *Id.* ¶¶ 86–95, 98–102.  Defendants contend that these sources are "inadmissible hearsay."  Def. Mem. at 12–13.  But, "although this objection may prevail on summary judgment, it does not on this Rule 12 motion."  *An v. City of New York*, No. 16 Civ. 5381, 2017 WL 2376576, at *4 (S.D.N.Y. June 1, 2017); *see also Medina*, 2020 WL 7028688, at *7 (considering plaintiff's citations to "specific news reports and other investigations" in denying motion to dismiss *Monell* claim).  Taken together and viewed in the light most favorable to Murphy, these allegations of drastic, widely reported racial disparities in COVID-19 policing support a "a

plausible inference that municipal liability may exist here, at least at the motion to dismiss stage."[8]
*Medina*, 2020 WL 7028688, at *7.

Murphy also alleges that the City has failed to "train or supervise" the NYPD officers tasked
with enforcing social-distancing restrictions "in a way that amounts to deliberate indifference."  *Id.*
To prove deliberate indifference, a plaintiff must show "(1) that a policymaker knows to a moral
certainty that her employees will confront a given situation; (2) that the situation either presents the
employee with a difficult choice of the sort that training or supervision will make less difficult or that
there is a history of employees mishandling the situation; and (3) that the wrong choice by
the employee will frequently cause the deprivation of a citizen's constitutional rights." *Okin v. Vill. of
Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 440 (2d Cir. 2009) (cleaned up).

Murphy's allegations support a plausible inference that these elements are met.  First, Murphy
adequately alleges that the City knew "to a moral certainty" that NYPD officers tasked with enforcing
social distancing "would confront situations that may lead to the use of force, including excessive
force," racial profiling, and other potential constitutional violations.  *Medina*, 2020 WL 7028688, at
*7; *see* Am. Compl. ¶¶ 70–74.  Murphy also alleges facts suggesting that "there is a history of
[officers] mishandling the situation," citing, for example, the "history of particularly problematic
policing" around public housing and against Black and Latinx individuals.  Am. Compl. ¶¶ 21, 31–
36 (citing *Floyd v. City of New York*, 959 F. Supp. 2d 540 (S.D.N.Y. 2013), and *Davis v. City of New
York*, No. 10 Civ. 0699 (S.D.N.Y.)).  The Individual Defendants' substantial disciplinary records—
and the City's alleged tolerance of police misconduct—further support the deliberate indifference

---

[8] Defendants also argue that Murphy has not established causation because "the arrest report for Jones'
arrest . . . demonstrates that Jones' arrest was not for a social distancing violation at all, but rather was an arrest for
completely unrelated reasons."  Defs. Mem. at 14; *see also id.* at 18.  The Court disagrees that the arrest report—which
charges disorderly conduct, obstruction of governmental administration, and resisting arrest, Am. Compl. ¶ 66—
conclusively disproves Murphy's claim that he and Jones were stopped under the pretense of violating social distancing
restrictions.  In any case, the report, which is not attached to the complaint nor integral to it, is not properly considered on
a Rule 12 motion. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2002).

claim.  Am. Compl. ¶¶ 117–19, 134–35.  Although Defendants challenge Murphy's allegations that their disciplinary measures were insufficient, see Def. Mem. at 17–18, they will have the opportunity to offer evidence on this point at summary judgment.

Defendants' motion to dismiss Murphy's *Monell* claims is, therefore, DENIED.

## CONCLUSION

For the reasons set forth above, the Defendants' motion to dismiss is GRANTED as to all of Colon's claims, as well as Murphy's (1) claims for equitable relief; (2) claims for violations of the New York state constitution, (3) due process claim; and (4) state-law claims for false arrest and false imprisonment, assault and battery, IIED, negligence, abuse of process, and negligent hiring, training, and supervision.  The motion is DENIED as to all other claims.  Accordingly, Murphy may proceed on claims one, two, and three.

The Clerk of Court is respectfully directed to terminate the motions at ECF Nos. 58 and 61.

SO ORDERED.

Dated: March 4, 2024
       New York, New York

_____
ANALISA TORRES
United States District Judge